753 F.2d 1552
 Wendell COOK, Plaintiff-Appellee, Cross-Appellant,
v.
The DELTONA CORPORATION, Marco Island Development
Corporation, Mackle Brothers Division, a
corporation, Defendants-Appellants,
Cross-Appellees.
 No. 83-5651.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 27, 1985.
 
 Joseph Mancilla, Jr., Miami, Fla., for defendants-appellants, cross-appellees.
 Larry Stumpf, Miami, Fla., Robert F. Childs, Jr., Birmingham, Ala., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Southern District of Florida.
 Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK*, Senior Circuit Judge.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 This appeal presents for review a breach of contract action together with ancillary issues of common law fraud, fraud and non-disclosure under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. Sec. 1701 et seq., and entitlement to attorneys' fees, interest, and costs with respect to these claims.
 
 
 2
 The district court directed a verdict for the plaintiff on the claimed breach of contract, directed verdicts for the defendant on all fraud claims, dismissed the statutory nondisclosure claims, denied attorneys' fees and prejudgment interest, and submitted the issue of damages for the breach of contract to the jury. The jury, finding the defendant breached the contract in bad faith, awarded loss-of-bargain damages. Defendant below, Deltona Corporation ("Deltona") appeals both the directed verdict on the breach of contract claim and the jury's bad faith finding and award of loss-of-bargain damages. Plaintiff below, Cook, cross-appeals the directed verdicts on his claims of common law and statutory fraud and punitive damages, and the dismissal of his statutory nondisclosure claims. Cook also contests the denial of attorneys' fees and prejudgment interest.
 
 
 3
 We approach this raft of issues seriatim, commencing with the breach of contract claim. Because the resolution of this case in large part turns upon who knew what when, the facts will be set out in detail.
 
 I. FACTS
 
 4
 A. The Marco Island Development.
 
 
 5
 In 1964 Deltona began purchasing land on Marco Island, Collier County, Florida, for the purpose of commercial and residential development. The project was to be financed in part with purchase monies paid to Deltona by installment contract purchasers over a period of many years. Because of the varying length of these contracts and the varying delivery dates specified in them, Deltona planned to complete development of the lots in the order of their scheduled delivery. To facilitate and organize this overall development Deltona divided the island into six construction areas which were then given popular names based upon nearby geographical features. Initially these areas were Marco River, Roberts Bay, Barfield Bay, Big Key and Collier Bay. In 1969 Deltona acquired the area in which the plaintiff's lot was to be located, Marco Shores.
 
 
 6
 At the time of its purchase by Deltona, much of the land to be developed was underwater. It was Deltona's plan to create the land for development through a process known as dredge and fill, the moving of earth from one shallow area to another, making a landfill. In order to accomplish this master plan, Deltona sought and obtained various development approvals, including county zoning approval of its master plan and, after required public hearings, county and state of Florida bulkhead line approvals setting out permissible dredge and fill areas for the planned community. After these bulkhead approvals were obtained, it was necessary to obtain specific dredge and fill permits from three authorities, Collier County, the state of Florida, and the United States Army Corps of Engineers.
 
 
 7
 In accordance with the geographical division of the development and the first delivery/first development plan of operation, in October, 1964 Deltona sought and obtained all necessary dredge and fill permits on the Marco River area. It is significant that in 1964 the Army Corps dredge and fill permit was issued almost automatically upon approval of the dredge and fill operation by county and state authorities. Development of Marco River proceeded apace.
 
 
 8
 Deltona next sought to obtain dredge and fill permits for Roberts Bay. County approval came on February 6, 1968; state approval, on April 15, 1968. In contrast to the earlier permitting process for Marco River, however, it was not until December 8, 1969 that Deltona was able to obtain Army Corps of Engineers dredge and fill permits approving the development of Roberts Bay. This was because the 1969 permit application was subject to a much more elaborate scrutiny by the Corps, a review encompassing the status of all sales on Marco Island, Deltona's master plan for the Marco Island community, and Deltona's plans for the development of adjacent land. Additionally, as part of its approval of the Roberts Bay dredge and fill permit, the Corps advised Deltona that each permit application was reviewed independently and that the approval of the Roberts Bay permit was not a guarantee that any further permits would be granted. Consequently, although Deltona was allowed to sell lots in three development areas, Barfield Bay, Big Key, and Marco Shores, the company had notice that Corps permits for these areas were not assured.
 
 
 9
 Shortly after receiving the Roberts Bay permit and its accompanying caveat, Deltona purchased the Marco Shores tract in which the plaintiff's lot was to be located. Following its established development plan, Deltona then sought county and state dredge and fill permits for Marco Shores. These permits were obtained prior to November 1971. Thereafter, Deltona's permitting experience with respect to tracts comparable to Marco Shores caused the company to conclude that seeking a dredge and fill permit for Marco Shores would be an exercise in futility. Accordingly, a Corps dredge and fill permit for Marco Shores was never requested. Deltona ceased selling Marco Shores lots in June of 1973.
 
 
 10
 B. The Cook Contract.
 
 
 11
 The scene now shifts from the west coast of Florida to Bent Waters Airforce Base in England where the plaintiff, in October, 1971, was a United States Air Force pilot. On October 30, 1971 Cook met with a Deltona salesperson, Ms. Pat Arens. On that date Cook executed a contract for the purchase of a lot in the Marco Shores development. Deltona executed the contract on November 15, 1971. The executed contract called for delivery of marketable title to the lot on or before May, 1980. In the event Deltona was unable to meet its obligations under the agreement the contract provided that Deltona would return to Cook all monies paid, including interest, toward the purchase of the property.
 
 
 12
 Over the next 11 years a series of events occurred culminating in the filing of this action on March 22, 1982. Because this case largely turns upon whether Deltona knowingly misrepresented to Cook its ultimate ability to perform by delivering title to the Marco Shores lot, we must look both to the actual state of Deltona's knowledge about its ability to develop Marco Shores, and to Deltona's representations to Cook on this subject. We examine each set of facts chronologically.
 
 
 13
 1. What Deltona knew.
 
 
 14
 In June of 1973 Deltona ceased selling lots in Marco Shores. In July of 1973 the Army Corps of Engineers advised Deltona that an Environmental Impact Study[1] would have to be conducted before a dredge and fill permit for Marco Shores would be issued. In March of 1975 Deltona revised its property report to indicate that the Marco River and Hudson Bay development areas had been approved for dredge and fill. This report specifically noted, however, that should Deltona be unable to obtain dredge and fill permits for other areas the company would tender a refund pursuant to agreement between the parties. In April of 1976 the Army Corps of Engineers denied dredge and fill permits for Barfield Bay and Big Key. In July of 1977 Deltona revised its offering statement to indicate that some Marco Island dredge and fill permits had been denied. Sometime prior to April, 1977 Deltona set up a state approved refund option program for the satisfaction of those customers whose lots could not be delivered because of the denial of required dredge and fill permits. It is undisputed that Deltona has never applied for a dredge and fill permit for Marco Shores.
 
 
 15
 2. What Deltona told Cook.
 
 
 16
 While these developments were taking place, Deltona corresponded with Cook about various problems in the purchase of the contract lot. In April of 1973 Cook, having encountered financial difficulty, called Deltona for aid in selling his lot. He was advised at that time that no development had taken place at Marco Shores, that the lots were still underwater, and that Deltona could not help him. In response to Cook's alternative request for a refund, Deltona advised no refund was available and that, in the event Cook defaulted on payments, the monies paid in to date would be kept as liquidated damages. Cook continued making payments.
 
 
 17
 In October or November of 1975 Cook learned from a friend that Deltona was encountering serious difficulties in the development of Marco Shores. Cook called Deltona and again demanded a refund. He was advised by Deltona's representative that the company was still trying to develop the lots and to make the May, 1980 delivery. As an alternative request, Cook asked for a payment moratorium. The company agreed, and Cook has made no further payments since November, 1975. In March of 1977 Deltona sent Cook a letter formalizing the moratorium and advising him that some dredge and fill permits for construction on Marco Island had been denied.
 
 
 18
 By letter dated April 13, 1977, and allegedly received by Cook in the summer of 1977, Deltona informed Cook that it was uncertain about the effect of the permitting problem on particular properties. Cook was advised of the state approved option refund program. Cook called Deltona to investigate the option program. He was informed that Deltona would exchange property for his rights in the Marco Shores lot. From an examination of the available exchange properties, Cook concluded a satisfactory exchange was not possible at this time.
 
 
 19
 In November of 1978 Cook called Deltona and requested a refund. Deltona told Cook the company was still working on delivering his lot and that he could not have a refund because the contract was still valid.
 
 
 20
 In February of 1979 Cook again called Deltona for information on the option of exchanging his lot for other Deltona properties. The company indicated that properties were available and that it would send information. When no information was received Cook called again about the possibility of exchange. In May of 1979 he received information on available exchange properties. No satisfactory exchange was available at this time.
 
 
 21
 In March of 1980 Cook called Deltona and was told that his property would not be delivered. In order to investigate exchange possibilities, Cook visited Deltona's headquarters in Miami. He sought, first, a refund of purchase monies and interest paid in for the purchase of the Marco Shores tract. This the company denied. The only refund available, the company told Cook, was through the company's option program.
 
 
 22
 In June of 1980 Cook received a letter from Deltona confirming that the company was unable to deliver his property. On November 5, 1981, Cook called Deltona's legal affairs department to complain about the company's actions and was told that he must either accept the refund available through the refund option program or instigate legal action against the company. In the event Cook chose to instigate legal action he should be aware that if everyone did so the company would be bankrupted and Cook left with a valueless cause of action.
 
 
 23
 Cook filed the instant complaint on March 22, 1982.
 
 II. THE CONTRACT ISSUES
 
 24
 A. Breach of Contract.
 
 
 25
 At the conclusion of all evidence in the case the district court granted a directed verdict for Cook on the breach of contract claim. Deltona conceded nonperformance but raised the affirmative defense of impossibility, arguing that performance was rendered impossible by the substantial and unforeseeable increase in regulatory requirements for the issuance of the required Army Corps of Engineers dredge and fill permits. In light of this concession and asserted affirmative defense, the propriety of the district court's directed verdict on the breach of contract claim rests upon an issue of law: whether Deltona's performance was rendered impossible by regulatory developments supervening between the formation of the contract in 1971 and the date of its scheduled performance in 1980.
 
 
 26
 There is a fascinating contradiction inherent in the judicially created impossibility defense which reveals a basic tension in the law. Contracts are born of the need for certainty. They are the merchant's exchange of serendipity for serenity, the deal upon which he can rely, for better or worse, months or years hence. A contract is insurance against change. The early common law enforced the policy by making contractual liability absolute, see e.g., 18 Williston, The Law of Contracts Sec. 1939 (3d ed. 1978), on the theory that a contractual duty, unlike a duty imposed by, for example, tort law, is tailored by the party for himself and any eventuality might be provided for in the contract. Paradine v. Jane, 82 Eng.Rep. 897 (K.B. 1647).
 
 
 27
 But change is what impossibility is about. As Professor Gilmore put it, it arises as a defense when "the real world has in some way failed to correspond with the imaginary world hypothesized by the parties to the contract." G. Gilmore, The Death of Contract 81 (1974). By recognizing impossibility as a sort of 'escape hatch' from the self-made chamber of contractual duty, the courts have recognized that absolute contractual liability is economically and socially unworkable. Impossibility accomodates the tension between the changes a party bargains to avoid and the changes, unbargained for and radical, that make enforcement of the bargain unwise.
 
 
 28
 Thus, it seems to us that the most profitable approach to an impossibility claim is not to pass on the relative difficulty caused by a supervening event, but to ask whether that supervening event so radically altered the world in which the parties were expected to fulfill their promises that it is unwise to hold them to the bargain. Ultimately the issue is whether the change was foreseeable. This is the rule in Florida. See Shore Investment Co. v. Hotel Trinidad, Inc., 158 Fla. 682, 29 So.2d 696 (1947); 11 Fla.Jur.2d Contracts Sec. 213 (1979).
 
 
 29
 In the case before us it is certainly clear that the regulation of dredge and fill activities on Marco Island, including the plaintiff's Marco Shores tract, increased substantially between 1971, the date of contracting, and 1980, the date performance was due. However, it is also clear that this increase in regulation was not beyond the contemplation of Deltona in 1971. As early as 1969 Deltona was informed by the Army Corps of Engineers that the Roberts Bay dredge and fill permit was granted but that subsequent permits would be reviewed independently and a subsequent determination made as to each. Although the Corps advised Deltona it could continue to sell land within an area encompassing the Marco Shores tract, the company was to be on notice that dredge and fill permits were not assured for any additional areas. This advice preceded Deltona's purchase of the Marco Shores tract. While it may be true that the extent of the ensuing regulations could not have been foreseen by the company in 1971, it is equally true that the winds of change were blowing and that Deltona was aware of that fact. This awareness disables Deltona's assertion that the increase in regulation changed basic assumptions upon which the contract was founded. Accordingly, we find no impossibility in this case. The district court's directed verdict for the plaintiff on the issue of breach of contract was therefore correct.
 
 
 30
 B. The Measure of Damages.
 
 
 31
 Having found a breach of the contract, the district court submitted to the jury the issue of damages accruing to the plaintiff from that breach. The jury was instructed that, if the breach were in good faith, the measure was to be a return to the plaintiff of his monies paid to the company on principal and interest. If bad faith were found, the jury might award loss-of-bargain damages equal to the value of the land at the time performance was due, less the amount remaining to be paid to Deltona under the contract. The jury found bad faith and awarded loss-of-bargain damages.
 
 
 32
 Deltona argues that there was no evidence to support a finding of bad faith and that the district court erred in submitting this issue to the jury. Cook responds that the district court was entitled to submit the issue of bad faith as a question of fact. As we view the case, both arguments misconceive the nature of the breach the district court was entitled to find from the evidence. The district court correctly found that Deltona did not perform, as clearly it did not. But it does not follow from that conclusion that Cook is entitled to the delivery date value of a plot of land which has never been developed.
 
 
 33
 The contract provided for two alternative means of performance: delivery or refund. There is no evidence that Deltona did not earnestly attempt to develop the Marco Shores tract. There is much evidence that Deltona delayed refund of Cook's money long past the time it was aware performance by delivery would never be made. Thus, Deltona's breach lay in the refusal to tender a refund of purchase monies and interest. It was this breach, not the failure to tender delivery of the Marco Shores lot, upon which the jury was entitled to decide the issue of bad faith and consequent loss-of-bargain damages.
 
 
 34
 The jury found bad faith on Deltona's part and thus accorded to Cook the right to his bargain, construed by us to be a timely refund. That right accrued on the date Deltona was aware, or should have been aware, that the Marco Shores tract would never be developed.[2]
 
 
 35
 Our resolution of the contract claims in this case thus presents a further question of fact. As Deltona's breach took place on the day it knew or should have known that the Marco Shores tract would never be developed, the bargain contemplated by the contract was a restoration of Cook to the status quo on that date. As that date is now at issue, and as no trier of fact has passed upon this question, we must remand to the district court for this determination.
 
 III. COMMON LAW FRAUD
 
 36
 The district court directed a verdict in favor of the defendant on the common law fraud claim. Reviewing that determination, this court must ask whether reasonable men in the exercise of impartial judgment might differ with respect to the existence of the elements of fraud. Neff v. Kehoe, 708 F.2d 639, 641 (11th Cir.1983).
 
 
 37
 As we stated in Banco Nacional De La Vivienda v. Cooper, 680 F.2d 727 (11th Cir.1982):
 
 
 38
 Under Florida law the plaintiff in a fraud action must prove (1) that the defendant falsely represented a specific material fact; (2) that the defendant knew, or should have known, that the representation was false, or that defendant made the representation without knowledge of its truth or falsity; (3) that the defendant intended to induce the plaintiff to act on the representation; and (4) that the plaintiff was injured while acting in reliance on the representation.
 
 
 39
 680 F.2d at 730.
 
 
 40
 We agree with the district court that the elements of fraud are not present in this case. The district court's directed verdict on this claim was correct. See Splitt v. Deltona, 662 F.2d 1142 (5th Cir. Unit B 1981); Alexander Davis Properties, Inc. v. Graham, 397 So.2d 699, 706-708 (Fla.Dist.Ct.App.1981).
 
 
 41
 IV. INTERSTATE LAND SALES FULL DISCLOSURE ACT CLAIMS
 
 
 42
 In addition to the breach of contract and common law fraud claims, Cook alleged three distinct violations of the Interstate Land Sales Full Disclosure Act ("the Act"), 15 U.S.C. Sec. 1701 et seq.[3] These were (i) fraud under section 1709(b)(1) incorporating by reference section 1703(a)(2), prohibiting the use of "any device, scheme or artifice to defraud" in the sale of a lot in a subdivision; (ii) nondisclosure of material facts in a Statement of Record under section 1709(a); and (iii) nondisclosure of material facts in a Property Report under section 1709(b)(2).
 
 
 43
 The district court found insufficient evidence of statutory fraud and dismissed that claim. The nondisclosure claims were dismissed as time-barred under section 1711 of the Act, setting out limitations of actions.A. Statutory Fraud.
 
 
 44
 The elements of land sales fraud under the pre-1979 Act were set out in section 1703(a):
 
 
 45
 It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--
 
 
 46
 * * *
 
 
 47
 * * *
 
 
 48
 (2) In selling or leasing, or offering to sell or lease, any lot in a subdivision--
 
 
 49
 (A) to employ any device, scheme, or artifice to defraud, or
 
 
 50
 (B) to obtain money for property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision and upon which the purchaser relies, or
 
 
 51
 (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.
 
 
 52
 15 U.S.C. Sec. 1703(a) (1976).
 
 
 53
 Arguing against the district court's dismissal of his statutory fraud claim, Cook urges evidence at trial raised a question of fact on this issue. He asserts essentially that Deltona misrepresented the development status of Marco Shores at the time Deltona, through its agent, Pat Arens, sold the lot to Cook. Cook now claims he believed Marco Shores to be an existing community, a sure thing, and that he believed delivery of his lot was equally sure. We find this assertion untenable in light of Cook's admission he knew, at the time of purchase, that the lot for which he was contracting was underwater. Thus, we agree with the district court that there was no evidence of land sales fraud in the formation of the contracts.
 
 
 54
 We note, however, that section 1703(a) of the Act has been interpreted to reach conduct involving additional wrongdoing after the formation of the contract. See Husted v. Amrep Corp., 429 F.Supp. 298, 307-308 (S.D.N.Y.1977), 52 A.L.R.Fed. 905, 917-18; Adair v. Hunt International Resources Corp., 526 F.Supp. 736, 749-50 (N.D.Ill.1981). Assuming arguendo this circuit would so interpret that statute, we look to determine whether evidence presented at trial gave rise to a jury question on the issue of fraud in the instant sale.
 
 
 55
 Any misrepresentations made to Cook as part of a continuing course of conduct to deceive him as to the progress of permitting for the Marco Shores development were necessarily made after October or November of 1975, the date Cook learned Deltona required permits to develop Marco Shores. And yet at the time Cook informed Deltona of his awareness of the permitting problem, he requested and received a payment moratorium. It is undisputed that no further monies were paid by Cook to Deltona after this time.
 
 
 56
 Those cases extending section 1703(a)(2) to additional wrongdoing occurring after the formation of the contract do so because the misrepresentations are intended to induce the continued payment of the monies under traditional land sales installment contracts. As stated by the court in Husted:
 
 
 57
 Ms. Husted claims that misrepresentations were made to herself and members of the class after their contracts had been signed for the purpose of inducing continued payments and additional purchases. Such behavior is surely within the reach at least of section 1703(a)(2)(B), which makes it unlawful 'in selling or leasing ... to obtain money for property' by means of misrepresentations on which the purchaser relies. In light of the language of this subparagraph (B) of section 1703(a)(2), the remedial purpose of the entire Act, and the common practice of selling undeveloped land by conditional sales contracts in which the seller retains a substantial incentive to induce continued payments, it is reasonable to apply the same construction to the general anti-fraud prohibitions of Secs. 1703(a)(2)(A) and (C), at least where the defendants are accused of specific, additional wrongdoing after the contract is signed. Thus, we conclude that misrepresentations or fraudulent or deceitful behavior occurring after a conditional land sales contract is signed, for the purpose of inducing continued payment by the buyer to the seller, may be actionable violations of section 1703(a)(2) ....
 
 
 58
 429 F.Supp. at 308 (emphasis added).
 
 
 59
 In light of the payment moratorium immediately granted by Deltona at Cook's request, any misrepresentation made to Cook by Deltona subsequent to 1975 were clearly not intended to induce continued payment of monies. For this reason any misrepresentations by Deltona after the payment moratorium were not fraudulent within the meaning of Sec. 1703(a)(2). We therefore conclude that the plaintiff failed to establish a jury issue as to statutory fraud continuing after the formation of the contract.
 
 
 60
 In the absence of fraud in the formation of the contract and in the continuing course of conduct between Deltona and Cook after the formation of the contract, the plaintiff has failed to make out a question of fact on the existence of fraud under the Act. Accordingly, we affirm the district court's directed verdict for Deltona on Cook's fraud claim under the Act.
 
 
 61
 B. Nondisclosure.
 
 
 62
 The district court dismissed Cook's nondisclosure claims under section 1709(a) and section 1709(b)(2) of the Act, finding them time-barred by section 1711, containing limitations of actions. Cook, apparently conceding that the period of limitations had run, argues that evidence adduced at trial raises a jury question as to whether the limitations period was tolled by Deltona's actions, and, alternatively, whether Deltona is equitably estopped from raising limitations as a defense.
 
 Section 1711 of the pre-1979 Act provided:
 
 63
 No actions shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year of the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser.
 
 
 64
 15 U.S.C. Sec. 1711 (1976). Before addressing the issues of equitable tolling and equitable estoppel, we must first determine when the limitations period commenced in the instant case.
 
 
 65
 By its terms, section 1711 required all claims under the Act to be brought not more than three years from sale. We must therefore construe the term "sale" as it applies to this case.
 
 
 66
 Courts construing the three-year limitations period of section 1711 are divided on the meaning of the term "sale" as used in that section. Essentially two distinct views emerge. An apparent minority of cases, typified by Newell v. High Vista, Inc., 479 F.Supp. 97 (M.D.Penn.1979), have held that a sale may take place either on the date of contract formation or on the date a deed to the property is executed. 479 F.Supp. at 99.
 
 
 67
 Another and, we believe, better reasoned view is set out in Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036 (10th Cir.1980). Aldrich and cases cited therein hold that the sale takes place at the time the initial contract is signed. 627 F.2d at 1044. This decision arises from a number of persuasive factors. The Aldrich court noted that regulations issued under the Act define a sale as "any obligation or arrangement for consideration to purchase." 24 C.F.R. Sec. 1710.1(n). Additionally, as Aldrich sensibly notes, because the statute under consideration governs not only sales of land but also leases, clearly passage of title should not be the critical factor in determining the accrual of a cause of action. 627 F.2d at 1044 n. 8. On balance, therefore, we accept the rationale of the Tenth Circuit's determination that a sale, for purposes of section 1711, takes place at the formation of the land sales contract. As the court in Aldrich stated:We are sensitive to the need for curbing unscrupulous real estate developers' incentive for fraudulently inducing purchasers to continue making payments on worthless contracts. However, we are limited by a statute which represents a cautious intrusion into a new field of federal regulations and we are not at liberty to extend liability as plaintiffs suggest.
 
 
 68
 627 F.2d at 1044 (footnote omitted). Accordingly, we hold that the "sale" in the instant case took place at the formation of the contract on November 15, 1971.
 
 
 69
 Because the three-year limitations period commenced on November 15, 1971 and this action was filed on March 22, 1982, clearly this action is time-barred unless the running of the period was tolled or, alternatively, Deltona is equitably estopped from asserting limitations from the period November 15, 1971 to on or before March 22, 1979, three years prior to the filing of the instant complaint. We address each of these considerations separately.
 
 
 70
 1. Equitable Tolling.
 
 
 71
 Principles of equitable tolling are read into every federal statute of limitation. Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). However, equitable tolling is a matter of congressional prerogative and can be read in only in the absence of congressional intent to the contrary. See e.g., Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 234, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959); Holmberg, 327 U.S. at 395, 66 S.Ct. at 584; Aldrich, 627 F.2d at 1042. The cases construing section 1711 have generally concluded that the bifurcated limitations scheme of that part manifests a congressional intent to avoid equitable tolling with respect to the three-year limitations period, while retaining the possibility of equitable tolling as to the one-year limitations period. See e.g., Aldrich, 627 F.2d at 1043; Timmreck v. Munn, 433 F.Supp. 396, 408 (N.D.Ill.1977).
 
 
 72
 Where the statute expressly provides for a tolling period for a fraudulent concealment, and then includes a secondary date which 'in no event' can be surmounted, there is good basis for belief that the latter date was intended as an absolute barrier to the filing of suit.
 
 
 73
 Timmreck v. Munn, 433 F.Supp. at 408. See also Husted, 429 F.Supp. at 306; Hester v. Hidden Valley Lakes, Inc., 404 F.Supp. 580, 582 (N.D.Miss.1975); Maher v. J.R. Williston & Beane, Inc., 280 F.Supp. 133, 137 (S.D.N.Y.1967). But see, Fuls v. Shastina Properties, Inc., 448 F.Supp. 983, 987-88 (N.D.Cal.1978); Happy Investment Group v. LakeWorld Properties, Inc., 396 F.Supp. 175, 188 (N.D.Cal.1975).
 
 
 74
 Again, the rationale set out in Aldrich is persuasive. Interpreting section 1711 as absolutely barring any action under the Act brought more than three years after the date of contract formation parallels the interpretation given to section 13 of the Securities Act of 1933, the statute upon which the Act was based.[4] We therefore hold that, while the one-year limitations period of section 1711 was susceptible to equitable tolling, the three-year limitation period of that section was not. The three-year limitations bars the plaintiff's nondisclosure claims unless Deltona is equitably estopped from raising limitations as a defense.
 
 
 75
 2. Equitable estoppel.
 
 
 76
 The same cases that have recognized the bifurcated limitations scheme of section 1711 and the rule that the three-year limitations period is absolute have also recognized a conceptual distinction between equitable tolling and equitable estoppel. See Aldrich, 627 F.2d at 1043 n. 7; Bomba v. W.L. Belvidere, Inc., 579 F.2d 1067 (7th Cir.1978). As stated by the Aldrich court:
 
 
 77
 In Bomba ... it was held that the ... [Act's] statute of limitations is not a bar to the application of the doctrine of equitable estoppel. We agree with the seventh circuit's conclusion that equitable estoppel may prevent reliance on the statute of limitations which nevertheless cannot be tolled by other equitable principles. Equitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer prevails upon the other to forego enforcing his right until the statutory time has lapsed. The doctrine of equitable tolling, on the other hand, is grounded in the fraudulent concealment of harm which gives rise to the right to sue. Section 1711 of the ... [Act] recognizes the problem of discovering the violation, but nonetheless cuts off suit three years after sale. It therefore appears to bar equitable tolling at three years while leaving open the possibility of equitable estoppel.
 
 
 78
 Aldrich, 627 F.2d at 1043 n. 7 (citations omitted).
 
 
 79
 The plaintiff's cause of action expired three years and one day after the formation of the contract, November 16, 1974. The misrepresentations which the plaintiff alleges as a basis for equitable estoppel of Deltona from asserting limitations as a defense did not commence until, at the earliest, October 1975, the date Cook learned Deltona was having difficulty obtaining development permits for Marco Shores. Thus, plaintiff's cause of action for statutory nondisclosure under the Act expired before the actions of the company asserted as the basis for equitable estoppel took place. The company's misrepresentations could not have induced forbearance from bringing suit when the suit was barred before those misrepresentations could have commenced. Equitable estoppel is unavailable in this case. Cook's nondisclosure claims are time-barred. The district court's dismissal of the claims was correct.
 
 V. PUNITIVE DAMAGES
 
 80
 The district court directed a verdict for Deltona on Cook's claims for punitive damages arising (i) from the breach of contract and (ii) from fraud. Answering Cook's claim of error on this point, we hold the district court ruled correctly.
 
 
 81
 Under Florida law punitive damages are available only upon a showing that the act complained of is characterized by "willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate violence, moral turpitude, insult, or fraud." 17 Fla.Jur.2d Damages Sec. 119 (1980). See also Griffith v. Shamrock Village, 94 So.2d 854, 858 (Fla.1957); Charter Air Center, Inc. v. Miller, 348 So.2d 614, 616 (Fla.Dist.Ct.App.1977). Whether punitive damage liability arises as a consequence of a tort or a coincidentally tortious breach of contract duty, the issue is the same, an assertion of a duty breached. The availability of punitive damages turns upon the moral turpitude, or lack thereof, involved in that breach. Splitt v. Deltona Corp., 662 F.2d 1142, 1145 (5th Cir. Unit B. 1981). As we stated in Splitt, the distinction is between "non-feasance and misfeasance." 662 F.2d at 1145. So interpreting Florida law, we are unwilling to add the instant case to that "impressive number of cases in which courts have approved the award of punitive damages in 'contract' actions without even bothering to go through the ritual of converting them into 'tort' actions." Gilmore, supra, at 83.
 
 
 82
 Reviewing the evidence adduced in this case we find no indication of tortious conduct, of misfeasance, or of moral turpitude. We thus conclude the district court correctly ruled punitive damages to be unavailable by directing a verdict on that claim. See Splitt, 662 F.2d at 1145-48.
 
 VI. ATTORNEY'S FEES
 
 83
 The district court denied attorneys' fees to Cook and he appeals that ruling. We affirm.
 
 
 84
 Florida has long adhered to the "American Rule" under which attorneys' fees are generally awarded only where authorized by contract or statute. See e.g., Dorner v. Red Top Cab & Baggage Co., 160 Fla. 882, 883, 37 So.2d 160, 161 (1948); DeLuca v. Ray's Inn, Inc., 419 So.2d 1103, 1104 (Fla.Dist.Ct.App.1982); 12 Fla.Jur.2d Costs Sec. 31 (1971). There are, of course, exceptions. If the party seeking fees can demonstrate the specific, certain and conclusive existence of malice or fraud, attorneys' fees are available. Baya v. Central & Southern Florida Flood Control District, 184 So.2d 501, 502 (Fla.Dist.Ct.App.1966).
 
 
 85
 Neither the instant contract nor any applicable state statute authorizes attorneys' fees in this action. Cook has no federal cause of action. There has been no showing of malice or fraud. Thus Cook is not entitled to attorneys' fees and the district court's ruling on this issue was correct.
 
 VII. PREJUDGMENT INTEREST
 
 86
 As we view this case, Cook was entitled under the terms of his contract to a refund of interest and principle paid toward the purchase of the Marco Shores lot as of the date Deltona determined it would be unable to perform by delivering that lot. Under Florida law, recovery of interest in actions growing out of contract is allowed from the time the cause of action accrues. 32 Fla.Jur.2d Interest and Usury Sec. 5 (1978). Where the amount of liability is fixed and ascertainable on the date of breach, that amount bears interest from the date of breach. Id. A claim is unliquidated under Florida law when the amount of damages depends upon conflicting evidence, inferences and interpretations. Longboat Key v. Carl E. Widell & Son, 362 So.2d 719, 722-23 (Fla.Dist.Ct.App.1978). However, the existence of a bona fide dispute as to whether a debt is actually owed does not give rise to an unliquidated claim. 32 Fla.Jur.2d, Interest and Usury Sec. (1981). "The rule is that if it is finally determined that the debt was due, the person to whom it was due is entitled not only to payment of the principal, but to interest at the lawful rate from the due date thereof." Parker v. Brinson Construction Co., 78 So.2d 873, 874 (Fla.1955); Nationwide Mutual Insurance Co. v. Griffin, 222 So.2d 754, 756 (Fla.Dist.Ct.App.1969).
 
 
 87
 On these authorities we conclude that Deltona, by breaching its contractual duty to refund Cook's purchase monies and interest, gave rise to a liquidated claim accruing on the date of breach. Accordingly, we find Cook to be entitled to prejudgment interest from the date Deltona knew, or should have known, that it would never be able to make delivery of the Marco Shores lot to Cook. We direct that the district court determine and award this interest on remand.
 
 VIII. SUMMARY
 
 88
 In summary we hold: (1) the directed verdict on the breach of contract is affirmed; (2) the jury's award of loss-of-bargain damages is vacated and the issue of damages remanded to the district court for a determination of the date from which those damages accrued, the date Deltona knew, or should have known, it would be unable to perform the contract by delivery; (3) the directed verdicts for the defendant on the issue of common law fraud and fraud under the Interstate Land Sales Full Disclosure Act are affirmed; (4) the dismissal of nondisclosure claims under that Act is affirmed; (5) the denial of attorneys' fees is affirmed; and (6) the denial of prejudgment interest is reversed and remanded to the district court for the determination and award of damages from the date of contract breach.
 
 
 89
 AFFIRMED in part; REVERSED in part; and REMANDED.
 
 
 
 *
 Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 An Environmental Impact Study assesses the effect of the proposed development on the environment. Included within its scope are reviews of impact on soil quality, vegetation, water quality, commercial fishing, and like variables
 
 
 [2]
 Our view of this case acknowledges Deltona's argument that the concept of loss-of-bargain damages presupposes the existence of a contractual benefit. In the case before us there is no benefit; the land from which any benefit was to have accrued remains under the waters of the Gulf of Mexico. In a context such as this the best that could be hoped for would be a return to the status quo. It was in failing to fulfill its promise to make that return that Deltona breached its contractual duty to Cook
 
 
 [3]
 The Act, originally entitled The Housing and Urban Development Act of 1968, Public Law 90-448, 82 Stat. 476 (1968), was amended by the Housing and Community Developments Amendments of 1979, Public Law 96-153, 93 Stat. 1101 (1979). Because the events giving rise to this litigation took place prior to 1979, and because the 1979 amendments are not retroactive, see Fitzgerald v. Century Park, Inc., 642 F.2d 356 (9th Cir.1981), in reviewing Cook's claims under the Act we look to the law in effect prior to 1979
 
 
 [4]
 As the court in Aldrich stated,
 The three-year limitation in the 1933 Act, 15 U.S.C. Sec. 77m, has been held to be an absolute bar, notwithstanding allegations of fraudulent concealment. See Brick v. Dominion Mortgage & Realty Trust, 442 F.Supp. 283, 291 (W.D.N.Y.1977); Fischer v. International Telephone & Telegraph Corp., 391 F.Supp. 744, 748 (E.D.N.Y.1975); Shonts v. Hirliman, 28 F.Supp. 478, 486 (S.D.Cal.1939); Cowsar v. Regional Recreations, Inc., 65 F.R.D. 394, 399 (M.D.La.1974).
 627 F.2d at 1043.