**Richard & Valerie ADAMS, et al., Plaintiffs,**

v.

**CAVANAGH COMMUNITIES CORP., et al., Defendants.**

No. 81 C 7332.

United States District Court, N.D. Illinois, E.D.

March 10, 1994.

Eugene J. Frett, Stephen J. Spitz, Sperling, Slater & Spitz, P.C., Christopher James Murdoch, Stein, Ray & Conway, Chicago, IL, for plaintiffs.

Robert A. Downing, Sidley & Austin, Barbara Merrey DeCoster, Wilber H. Boies, Lawrence E. Zabinski, Paul Evans Chronis, McDermott, Will & Emery, Chicago, IL, W. Paul Tobin, Crowley & Cuneo, Los Angeles, CA, for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### I. INTRODUCTION

This action, filed on behalf of more than one thousand Plaintiffs, alleges that Cavanagh Communities Corp. ("Cavanagh Communities"), Cavanagh Land Sales Corp. ("Cavanagh Land Sales"), Joseph and Zola Klein ("the Kleins"), John Sgarlat, (collectively "the Cavanagh Defendants") and television personality Ed McMahon perpetrated a comprehensive land fraud scheme that defrauded Plaintiffs and other investors of millions of dollars. Plaintiffs' Seven Count Amended Complaint seeks remedies under the Securities Act of 1933, ch. 38, 48 Stat. 74 (codified as amended in scattered sections of 15 U.S.C. (1988)); the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (codified as amended in scattered sections of 15 U.S.C. (1988)); the Interstate Land Sales Full Disclosure Act ("ILSFDA"), Pub.L. No. 90–448, 82 Stat. 590 (1968) (currently codified as amended at 15 U.S.C. §§ 1701–1720) (1988)); the Racketeer Influenced and Corrupt Organizations Act ("RICO"), ch. 96, 84 Stat. 941 (1970) (currently codified as amended at 18 U.S.C. §§ 1961–1968 (1988)); and the common law of fraud and contract.

Before the Court is Defendant McMahon's Renewed Motion to Dismiss and the Cavanagh Defendants' Motions to Dismiss and for Summary Judgment. For the following reasons, the Motions to Dismiss are granted in part and denied in part. The outstanding Motions for Summary Judgment are denied, without prejudice.

### II. ALLEGATIONS OF FACT

With the Court assuming as true all of the well pleaded allegations of Plaintiffs' Amended Complaint, and reasonable inferences therefrom, the facts of this case are as follows. In 1969, Cavanagh Communities acquired approximately 26,000 acres of land in central Florida, and commenced plans for the development of a community entitled Rotonda West. Joseph Klein was the original chairman of the board, chief operating officer, and largest stockholder of Cavanagh Communities, and was one of the driving forces in promoting Rotonda West. Zola Klein was an officer and director of Cavanagh Communities, and also was actively involved in promoting the project.[1] John Sgarlat was chairman of Cavanagh Communities at the time the original Complaint in this case was filed.

Cavanagh Land Sales was a wholly owned subsidiary of Cavanagh Communities which was used to market Rotonda West. Cavanagh Communities employed other subsidiaries, referred to here as the "Cape Corporations," in developing Rotonda West.[2] Employing a model constructed for a defunct project called "Rotonda East", the Kleins began marketing Rotonda West as an opportunity to acquire undeveloped land that would rapidly appreciate in value as a result of promised development. The project was to become a self-contained community, replete with homes, paved roads, canals, parks, golf courses and other facilities and was to be ringed with seven subdivisions promoted as "suburbs". As a result of their efforts, the

---

**1.** Named as co-conspirators, but not Defendants, were Andrew Heine and his law firm, the now-defunct Finley, Kumball, Wagner & Heine. Because they have not been named as Defendants, the Court declines to specify the alleged acts of conspiracy which Heine and the Finley firm are said to have committed.

**2.** These corporations were Cape Cave Corporation, Rotonda West Utilities Corporation and Cape Haze Corporation. Although the Amended Complaint was less than clear in its description of these subsidiaries' roles in the development, at least one of them, Cape Cave Corporation, appears to have executed the contracts with the lot purchasers. (Am.Compl. ¶ 36.)

promoters sold over one thousand lots. Many of those purchasers are Plaintiffs in this case.

Plaintiffs allege that the Kleins and the other Defendants induced them to purchase lots in Rotonda West by misrepresenting the actual value of the property and the ability of Cavanagh Communities and the Cape Corporations to develop and improve it. These Defendants artificially increased the price of Rotonda lots throughout the period of sales in order to deceive earlier purchasers into believing that their lots were appreciating in value, when, in fact, the lots were virtually worthless.

The terms of a given Plaintiff's investment in Rotonda West were governed by that Plaintiff's sales contract. The Plaintiffs' sales contracts provided for payment through monthly installments over approximately ten years coupled with annual interest rates of five percent to seven and a half percent. These contracts forbade purchasers to build on their property until all installments were paid. Until the purchase price and cost of improvements were fully paid, the developers retained title and possession of the lots. In addition, purchasers were required to grant Cavanagh Communities a right of first refusal on any resales. Plaintiffs who had not completed paying for their lots were prohibited from offering their property for resale without the express permission of Cavanagh Communities.

The concealment was further facilitated by the fact that approximately ninety-five percent of the lot sales were made to out-of-state investors who were not likely to visit the property and who depended on information from Defendants concerning the development of the property.

By 1975, Cavanagh Communities was promoting the Rotonda West project in twenty-seven cities located in sixteen states. The sales force used false and misleading slides, films, property reports and sales brochures to induce investors to purchase lots. These materials promised that Rotonda West, which was to include seven golf courses and club houses, a marina, thirty-two miles of canals, and extensive shopping, commercial and recreational facilities, would be complet-ed by 1977. The "suburban" subdivisions surrounding Rotonda West were similarly promoted, with promised improvements to be completed between 1977 and 1981. The latest specified completion date for all improvements was January 1, 1983. Refunds were promised if the improvements were not made as planned. The overriding theme of these promotional activities was that the purchase of lots at the Rotonda project was a good investment, superior in kind to alternative investments such as bonds, insurance, savings or stocks. Much of the promotional literature was mailed to prospective purchasers.

Plaintiffs allege that in furtherance of the comprehensive scheme to defraud, Defendants also filed inaccurate reports with the Securities and Exchange Commission and several state regulatory agencies. These reports failed to disclose that Cavanagh Communities lacked certain permits and approvals, that flooding conditions existed at Rotonda, that governmental and environmental restrictions and prohibitions existed regarding development of the Rotonda property, and that prohibitive economic factors existed. At the time the original Complaint in this case was filed, on December 31, 1981, over ninety-five percent of the lots remained undeveloped and could not be accessed by conventional means because of flooding and other environmental hazards. Aside from one "core" community in the project, built as a showplace model and where approximately 700 families eventually resided, the Defendants neither developed the property in accordance with their original promises nor refunded any portion of Plaintiffs' installment payments.

The majority of the 22,000 unimproved lots in the Rotonda project were sold between 1969 and 1975. Prices ranged from $7,690 to $13,740 for "single-family homesites", and from $14,840 to $28,240 for "multiple family homesites". The comparable residential price ranges in the suburban subdivisions were from $4,540 to $11,390 for single-family sites, and from $9,840 to $61,890 for multiple-family sites.

Instrumental in the sales, Plaintiffs allege, were the activities of Ed McMahon. Hoping

to parlay McMahon's television fame into lot sales, the Cavanagh Defendants hired him as the project's advertising spokesman. As compensation, McMahon received "approximately $500,000 in the form of cash payments, a home at Rotonda designed by a world famous architect, home furnishings, lots in the Rotonda West Cove area, and common stock of Cavanagh Communities." (Am.Compl. ¶ 47.) In addition, McMahon was named an officer of Cavanagh Communities in November 1970.

McMahon agreed to the use of his likeness, name and statements attributed to him in sales brochures, company newspapers, magazines, letters, and other sales and promotional materials. Most important, according to Plaintiffs, was the use of a film narrated by McMahon at presentations for prospective purchasers. Under the terms of his contract with the developers, McMahon's approval was required before the developers could use any sales materials involving him. Throughout these materials, Plaintiffs allege, were a series of misrepresentations concerning the scope of McMahon's involvement in the project, the rise of Rotonda property values, and the project's ultimate potential for success. Plaintiffs allege, among other things, that the various promotional materials included untrue claims that McMahon was a substantial investor in Rotonda West and an active officer in Cavanagh Communities who participated in the determination of policies and the review of development plans.

In 1973 and 1974, disgruntled lot purchasers began sending McMahon letters complaining that the lots were not being developed as promised. McMahon began correspondence with Cavanagh Communities, requesting that the film he had narrated no longer be used for lot sales. Eventually, the developers agreed to pay McMahon at least an additional $100,000 in return for the continued use of his name and likeness on other sales materials.

Plaintiffs allege that Cavanagh Communities, "in conspiracy" with the Kleins, Cavanagh Land Sales and McMahon, distributed to Plaintiffs and other lot purchasers, either directly or through management agents, a stream of information designed to conceal the asserted land fraud. Plaintiffs cite a number of statements made by Defendants from 1972 to 1980. These statements include several made in the "The Rotonda Review", a company-published newspaper sent to lot owners through the date that the original Complaint was filed. Among the statements made in The Rotonda Review were discussions of a Federal Trade Commission investigation. These statements were issued in 1975 and included the claims that "the 'principal focus of the FTC appears to be towards projects other than Rotonda,'" and "'we are attempting to have the FTC clarify its position so that there can be no doubt that there are no serious objections concerning Rotonda.'" (Am.Compl. ¶ 70.) Generally, Defendants' statements represented that progress on the completion of the project was continuing more or less as planned. Moreover, the company newspaper failed to inform the Plaintiffs that other lot purchasers had filed suit against the promoters for failure to fulfill their contractual obligations in the development of the project, and that the Rotonda property was decreasing in value.

Meanwhile, the business fortunes of Cavanagh Communities took a turn for the worse. In February 1975, the Ford Motor Credit Company declared Cavanagh Communities in default on its guaranties of loans made to its subsidiaries, the Cape Corporations, for development of the core area of Rotonda. This caused Cavanagh Communities to file for reorganization under the bankruptcy laws later that month. In the course of the bankruptcy proceedings, Cavanagh Communities appointed the Deltona Corporation in 1976 to manage the properties. The Cavanagh subsidiaries, however, remained liable for any claims arising from the land-sale contracts, rather than the management company. The Deltona Corporation was succeeded as property manager in 1979 by Land Resources Corporation, which also did not assume liability for claims arising from the development of the project. These appointed managers continued sales activities, made improvements in the core areas of the development, collected payments and disseminated information to lot purchasers.

In 1978, Cavanagh Communities, the Kleins and Sgarlat, chairman of Cavanagh Communities at the time the original Complaint was filed, began planning the transition of Cavanagh Communities from land development into the casino and hotel business in Atlantic City, New Jersey. As part of this plan, Cavanagh Communities sold its Cape Corporations in 1980 to Rotonda Properties, Inc., a company formed in 1979. Plaintiffs claim that Rotonda Properties, Inc. had no assets, assumed no liability to develop the project, and was a sham intended to insulate Cavanagh Communities from its obligations to the lot purchasers. Cavanagh Communities subsequently changed its name to Royal International, Inc. and invested in Atlantic City properties.

### III. BACKGROUND

Management of this case has been complicated by a number of factors: the difficulty of conducting litigation involving many hundreds of Plaintiffs; the number of allegations, overlapping theories of relief and the often unsettled state of the law concerning many of these theories; the inability of some of the Defendants to retain counsel, resulting in numerous defaults; and the Defendants' often divergent interests.

The Court has thus far made two rulings affecting this case's organization. Before ruling on the instant motions, the Court addressed Defendant McMahon's Motion for Summary Judgment and rejected his contention that further proceedings against him were barred by a covenant not to sue. *Adams v. Cavanagh Communities Corp.*, 669 F.Supp. 870 (N.D.Ill.1987). Additionally, the Court ruled that it would initially address issues that could be resolved on motion to dismiss, and would thereafter consider other issues in a subsequent revised motion, or motions, for summary judgment, if appropriate. In a further attempt to organize this case, the Court now briefly addresses several procedural issues presented by the instant motions.

#### A. Motions for Summary Judgment

In reliance on the Court's orders organizing this case, Plaintiffs have not made evidentiary submissions addressing Defendants' motions for summary judgment. In addition, with the passage of time and the further development in the legal principles governing this suit, the Defendants may wish to revise and update their summary judgment arguments. Accordingly, in the interest of simplifying the procedural difficulties of this case as much as possible, the Court now denies all of the Defendants' Motions for Summary Judgment, without prejudice to their bringing revised motions consistent with this Memorandum Opinion and Order.

#### B. Alleged Improper Solicitation

The Cavanagh Defendants have argued that this case must be dismissed under the Court's "inherent authority" to dismiss actions in which plaintiffs have been improperly solicited. However, the Court need not pass on that allegation in order to conclude that whatever its "inherent authority", the Court's ordering, at this time, a dismissal of the facially nonfrivolous Amended Complaint based on "improper solicitation" would be an abuse of the Court's discretion.

#### C. Fed.R.Civ.P. 12(b)(7)

The Cavanagh Defendants also argue that this case must be dismissed, pursuant to Fed.R.Civ.P. 12(b)(7), for failure to join indispensable parties under Fed.R.Civ.P. 19. The assertedly indispensable parties are a Cavanagh Communities subsidiary, Cape Cave Corporation, and two of Cavanagh Communities' former agents, Deltona Corporation and Land Resources Corporation. Based upon the current record, the Court is unpersuaded that the failure to join these parties mandates a dismissal under the rigorous standards of Rule 19.

#### D. Fed.R.Civ.P. 9(b)

The Defendants have objected that the Amended Complaint fails to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). After carefully considering the allegations of the sixty-four page Amended Complaint, the Court concludes that Plaintiffs' allegations of fraud are minimally sufficient to withstand a Rule 9(b) motion to dismiss.

■ In order to satisfy the particularity requirements of Rule 9(b), a plaintiff must describe the contents of the allegedly false representations, their time, their place, the identity of the party or parties making the misrepresentations, and the consequences of the alleged fraud. *Midwest Grinding Co. v. Spitz*, 716 F.Supp. 1087, 1092 (N.D.Ill.1989), *aff'd*, 976 F.2d 1016 (7th Cir.1992). Here, Plaintiffs allegations push the limits of these requirements. However, Plaintiffs are not required to plead evidence. The Amended Complaint contains quoted material from the sales film in which Defendant McMahon made several representations about the Rotonda project. (Am.Compl. ¶¶ 49(a)–49(j).) Plaintiffs also allege fraud in several other quoted passages. (Am.Compl. ¶¶ 53(a)–53(x).) Additionally, Plaintiffs list several omissions that they claim are material, (Am. Compl. ¶¶ 55(a)–55(dd)), several quoted passages made at a 1975 meeting, (Am.Compl. ¶¶ 60(a)–60(c)), and several specific statements said to constitute fraudulent concealment, (Am.Compl. ¶¶ 70(a)–70(h) & (a)–(g)). Although the Amended Complaint does not contain allegations regarding how each and every one of the more than one thousand Plaintiffs was defrauded, it is apparent that each Plaintiff is relying on one or more of the statements alleged in the Amended Complaint. Given the great undertaking necessary to plead each of the *Midwest Grinding* factors for each of the Plaintiffs, the Court finds that Plaintiffs have satisfied their pleading requirements.[3]

### E. Standard for Motions to Dismiss

Defendants move to dismiss several of Plaintiffs' claims for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants also argue that Plaintiffs' claims are time-barred due to their failure to satisfy the relevant statute of limitations.

■ The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. *See Barkman v. Wabash, Inc.*, 674 F.Supp. 623 (N.D.Ill.1987). In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action.

*Davis v. Frapolly*, 747 F.Supp. 451 (N.D.Ill. 1989). The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." *Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Corp.*, 758 F.2d 203, 207 (7th Cir.1985).

■ The Court must accept as true all facts alleged in the complaint and reasonable inferences based on those facts. *Bane v. Ferguson*, 890 F.2d 11, 13 (7th Cir.1989). However, the Court need not accept as true conclusory legal allegations. *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 665 (N.D.Ill. 1987). Furthermore, the Court need not strain to find inferences from the complaint's allegations. *P & P Mktg., Inc. v. Ditton*, 746 F.Supp. 1354, 1357 (N.D.Ill.1990). When evaluating the legal sufficiency of a plaintiff's factual allegations, courts are held to a strict standard. A motion to dismiss may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■ As statutes of limitations form bases for affirmative defenses, plaintiffs are not required to allege facts demonstrating the timeliness of their suit. *See Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993) (stating this conclusion in a Rule 10b–5 case). Unless a plaintiff pleads facts that show his case is time-barred, *see id.*, a statute of limitations defense is best addressed on a motion for summary judgment. Here, the Court has indicated to the parties that a motion for summary judgment on the statute of limitations arguments may be necessary. However, on the current record, the Court can resolve several legal issues. The Court therefore proceeds with an analysis of those issues.

### IV. PLAINTIFFS' SECURITIES CLAIMS

In Counts Two and Three of their Amended Complaint respectively, Plaintiffs claim

---

**3.** Of course, Plaintiffs will have to supply specific facts to survive a motion for summary judgment.

that the Defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), the related Rule 10b–5, 17 C.F.R. § 240.10b–5 (1993), section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1988), and section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1988).

### A. Section 17(a)

■ In Count Two of the Amended Complaint, Plaintiffs claim that the Defendants have violated section 10(b) of the 1934 Act, Rule 10b–5, and section 17(a) of the 1933 Act. Defendants argue that, while there is an implied private right of action under the 1934 Act and Rule 10b–5, there is no such right of action under the 1933 Act and section 17(a). Under *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942–43 (7th Cir.1989), that argument must be accepted, especially when a plaintiff's complaint already attempts to state a claim under Rule 10b–5. It is now clear that a majority of courts have refused to imply a right of action under section 17(a). *Id.*

Accordingly, with respect to Plaintiffs' section 17(a) allegations, Defendants' Motion to Dismiss is granted.

### B. Existence of a "Security"

■ Plaintiffs' securities claims, based on Rule 10b–5 and section 12(2), require the demonstration of the existence of a security. Defendants contend that the Amended Complaint fails to do so.

The Securities Act of 1933 defines "security":

The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 15 U.S.C. § 77b(1) (1988). The definition contained in the 1934 Act, *see* 15 U.S.C. § 78c(a)(10) (1988), while worded somewhat differently from the 1933 Act definition, is construed as though it were identical. *See Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967); *Secon Serv. Sys. Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 411 n. 5 (7th Cir. 1988). Plaintiffs claim that their agreements to purchase property in the Rotonda project are "investment contracts", (*see* Am.Compl. ¶ 54; Pls' Mem. in Opp'n to Def. McMahon's Renewed Mot. to Dismiss at 35–36), within the broad definitions of "security" in the 1933 and 1934 Acts. *See* 15 U.S.C. § 77b(1) (1988) (including "investment contracts" within the definition of a security); 15 U.S.C. § 78c(a)(10) (1988) (same).

Neither the 1933 act nor the 1934 act defines what is an "investment contract". In the seminal case of *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court attempted to define the term. An investment contract, for the purposes of the federal securities acts, is a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 301, 66 S.Ct. at 1103.

In *Howey*, the Supreme Court held that a contract to sell property in a citrus grove, accompanied by an agreement for the property's promoters to continue harvesting and developing the property, was held to be an "investment contract", and therefore a security. The *Howey* investors purchased narrow, unseparated strips of land containing orange trees. The land was collectively managed and serviced by the plan's promoters and the profits were distributed based on the investors' allocable share of the land owned. Because the *Howey* scheme satisfied the Court's newly declared test, the investment instruments in that case were deemed "investment contracts".

Here, three parts of the *Howey* test are satisfied by the Amended Complaint. The Plaintiffs allegedly (1) "invested" in Defen-

dants' scheme and (2) relied solely on the promoters' efforts, (3) in hopes of attaining a profit. At issue here is whether Plaintiffs have sufficiently pleaded the existence of a "common enterprise" as required in *Howey* and as defined by the Seventh Circuit.

The Circuit Courts are split on the standard for demonstrating a "common enterprise". *See Mordaunt v. Incomco,* 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985) (White, J., dissenting from denial of writ of certiorari). According to the Fifth Circuit, commonality is established through "promoter dominance", meaning "whether the fortunes of the investments collectively" are "essentially dependent upon promoter expertise." *See SEC v. Continental Commodities Corp.,* 497 F.2d 516, 522 & n. 12 (5th Cir. 1974); *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473 (5th Cir.1974). In contrast with the Fifth Circuit rule, which is often called "vertical commonality", the Seventh, Sixth, and Third Circuits require a different test, called "horizontal commonality". *See Stenger v. R.H. Love Galleries, Inc.,* 741 F.2d 144, 146 (7th Cir.1984); *Hart v. Pulte Homes of Michigan Corp.,* 735 F.2d 1001, 1004 (6th Cir.1984); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 682 F.2d 459, 460 (3d Cir.1982).

Generally, horizontal commonality exists when multiple investors pool their investments and receive pro rata profits. *Stenger,* 741 F.2d at 146; *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96, 100–01 (7th Cir. 1977); *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972); *see also Secon Serv. Sys. v. St. Joseph Bank & Trust,* 855 F.2d 406, 411 (7th Cir.1988) (stating that pooling is required for an "investment contract", citing *Milnarik v. M–S Commodities, Inc.,* 457 F.2d at 276–78.).

This case is a close call. On the one hand, there is nothing in the Amended Complaint that indicates that the Plaintiffs expected anything like pro rata payment of profits. The success of one Plaintiff's investment and his profit from any increased value in his land was not to be shared pro rata with his co-investors. On the other hand, in virtually every other respect, Plaintiffs' Amended Complaint indicates that their investments were securities. The investments at issue were sold on a large scale basis to unsophisticated investors. According to the Amended Complaint, the lots were not sold as homesites or for any personal use.[4] Plaintiffs were not entitled, without the Defendants' approval, to improve their land or sell their interest in it until title passed. Even in those circumstances, Defendants were permitted a right of first refusal. The success of Plaintiffs' investments rested on the common improvement of the properties through Defendants' promised provision of infrastructure, golf courses, and other amenities. Thus, the Defendants' proposed common undertaking was the "thread on which everybody's beads were strung." *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 348, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943). In the opinion of the Court, Plaintiffs' allegations that their investments rose and fell together, and their allegations tending to show that they all shared a common risk in the development are sufficient to withstand a motion to dismiss. Two cases are particularly instructive in this regard.

In *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036 (10th Cir.1980), a case decided without the benefit, or hinderance, of a discussion of horizontal or vertical commonality, the Tenth Circuit found that a class of plaintiffs had alleged the existence of a security, sufficient to withstand a motion to dismiss. The *Aldrich* plaintiffs alleged that they purchased, from real estate developers, lots of

---

**4.** Of course, in this opinion, the Court bases its factual assumptions on the allegations contained in the Amended Complaint. Thus, the Court does not hold that as a matter of fact, each Plaintiff bought land through an "investment contract", or that each Plaintiff's installment contract was necessarily a security. It is currently unclear how many Plaintiffs purchased their lots to build a home in which to live. It may be that several Plaintiffs purchased their lots to build a retirement home for the future. These facts may bear on the legal status of those Plaintiffs' installment contracts. At this point, the Court does not determine whether any Plaintiff's securities claim would survive a motion for summary judgment or a motion, at trial, for judgment as a matter of law.

land, with investment intent, based on the developers' promotional representations that the land would be developed for the plaintiffs' common benefit and that a trust would be established to construct and operate the facilities. *Id.* at 1039. In holding that the plaintiffs had stated facts sufficient to withstand a motion to dismiss, the Tenth Circuit reasoned that its conclusion was dictated by the Supreme Court's emphasis on the developer's means of promotion in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), and by a factual question regarding whether the properties were to be used primarily for investment purposes.

In *Hart v. Pulte Homes of Michigan Corp.,* 735 F.2d 1001 (6th Cir.1984), the Sixth Circuit distinguished *Aldrich* in holding that the plaintiffs therein had failed to allege the existence of a security. The *Hart* plaintiffs had separately purchased 23 model homes from the defendant, a real estate developer and residential builder. The homes were to be used not as residences, but as investments; they were leased back to the defendant for use as model homes. When the homes did not appreciate in value, the plaintiffs sued. In holding that the plaintiffs had failed to state a claim, the Sixth Circuit found that, unlike in *Aldrich,* the fate of each investor's investment was not tied to the development of that investor's subdivision. *Id.* at 1005. The *Hart* court noted that the plaintiffs' complaint made no allegations regarding a pooling of risks and investments among the plaintiffs. *Id.* As a result, the plaintiffs had failed to demonstrate the "horizontal commonality" required by the Sixth and Seventh Circuits. *See id.* at 1004 (citing to *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.), *cert denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972)).

In the opinion of the Court, Plaintiffs have alleged facts sufficient to demonstrate the existence of a security, despite the fact that they may fail to satisfy the strictest interpretation of the "horizontal commonality" requirement. While the Seventh Circuit's decisions in *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96 (7th Cir.1977), *Milnarik v. M–S Commodities, Inc.,* 457 F.2d 274 (7th Cir.),

*cert. denied,* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972), and *Secon Service System Inc. v. St. Joseph Bank & Trust Co.,* 855 F.2d 406 (7th Cir.1988), might be read to require both a pooling of funds for common benefit *and* a pro rata distribution of profits, those cases may also be read to require only a pooling of funds for common benefit and a mutually shared investment risk. In the opinion of the Court, an investment plan's pro rata distribution of profits, or lack thereof, should not be a litmus test for the existence of a security. Therefore, the Court reads the Seventh Circuit precedent to permit a finding that Plaintiffs sufficiently have alleged the existence of a security to withstand a motion to dismiss.

Neither *Hirk,* nor *Milnarik,* nor *Secon* turned on the defendants' failure to distribute pro rata profits. Rather, each case's discussion of "investment contracts" required a "pooling of funds". Such a pooling of funds, and a pooling of risk, is here alleged. Like in *Aldrich,* and unlike in *Hart,* the fortunes of the Plaintiffs' investments were tied to, and entirely dependant upon, the efforts of the developers for the success of each investment. Plaintiffs have thus demonstrated both horizontal and vertical commonality. *But cf. Wals v. Fox Hill Dev. Corp.,* 828 F.Supp. 623, 625 (E.D.Wis.1993) (granting defendants' motion for summary judgment when profits from time-share development project were not pooled despite fact that plaintiffs' investment risk was shared with others).

Accordingly, as Plaintiffs allege that the "investment contracts" in this case were marketed as investment opportunities, were not available for residential use or individual improvement, and required mutual shared risk, the Court finds that Plaintiffs have alleged facts demonstrating the existence of a security.

### C. Whether Plaintiffs' Rule 10b–5 Claims are Time Barred

With respect to Plaintiffs' Rule 10b–5 claim, the primary issue in contention is whether the claim is time-barred. According to the Amended Complaint, Plaintiffs entered into their installment contracts between 1969

and 1975. (Am.Compl. ¶ 24.) They filed their original Complaint in this case on December 31, 1981, at least six years after the latest date the investment contracts were entered into. Defendants thus contend that Plaintiffs have failed to satisfy the requirements of any applicable statute of limitations.

Analysis of this issue requires several inquiries, every one of which is contested by the parties. The Court must determine (1) which statute of limitations applies, the one supplied by federal common law or the one supplied by Illinois statutory law; (2) when that statute starts to run; and (3) if, and when, that statute stops running, i.e. whether, and for how long, the applicable statute is "tolled."

### 1. The Applicable Statute of Limitations and the Short Decision

As the remedy for a violation of Rule 10b–5 was implied by a court, rather than created by Congress, courts have had to look elsewhere for the remedy's applicable statute of limitations. *See Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1387–88 (7th Cir.1990) (discussing the history of the Seventh's Circuit's adoption of state and federal statutes of limitation), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Until the Seventh Circuit's decision in *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991), courts in this Circuit borrowed statutes of limitations from state blue sky law. *Id.* at 1387.

In *Short*, the Seventh Circuit changed course and held that "federal and not state law supplies the statute of limitations in suits under § 10(b) and Rule 10b–5." *Id.* at 1389. There, the Seventh Circuit adopted section 13 of the Securities Exchange Act of 1933, 15 U.S.C. § 77m (1988). That section states:

No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(1) of this title, unless

brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(2) of this title more than three years after the sale.

15 U.S.C. § 77m (1988). Under section 13, a plaintiff must bring a securities action within one year after discovering fraud, but no more than three years after the date the security was sold. The section thus creates a one year statute of limitations and a three year statute of repose. Although this one/three combination was adopted and applied in *Short*, that decision specifically stated that it left open "all questions concerning retroactive application" of that decision. *Short*, 908 F.2d at 1389.

Retroactivity questions were apparently resolved, when the Supreme Court decided the two cases entitled *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), thereby ushering in the retroactive application of section 13. In *Lampf*, as the Seventh Circuit had previously done in *Short*, the Supreme Court adopted, for all Rule 10b–5 actions, the statutes of limitations and repose provided by section 13 of the Securities Act of 1933. The *Lampf* decision, coupled with rules of retroactivity adopted in *Beam*, thus required the retroactive application of section 13 in all Rule 10b–5 cases. Reacting to the *Lampf* and *Beam* decisions, Congress amended section 27A of the Securities Exchange Act of 1934 Act to cancel the retroactive effect of the decisions. The amended section 27A returned certain litigants to pre-*Lampf/Beam* law.

As the Seventh Circuit decided *Short* before *Lampf/Beam*, that decision constitutes the pre-*Lampf/Beam* law in this Circuit. Thus, in this Circuit, the law was essentially as the Supreme Court later interpreted it in *Lampf.* However, the rules governing retroactive application of case law were found in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1991), not *Beam.*

The *Chevron Oil* case provided a three step test to determine if a case should be applied retroactively. Under that case, a new rule is to be applied only prospectively, and not retroactively, where:

> (1) the decision at issue overrules clear precedent on which litigants may have relied or addresses an issue of first impression which was not foreshadowed; (2) retroactive application of the decision would retard the operation of a federal statute; and (3) retroactive application would result in substantial inequity.

*McCool v. Strata Oil Co.*, 972 F.2d 1452, 1459 (7th Cir.1992) (citing *Chevron Oil*, 404 U.S. at 106–07, 92 S.Ct. at 355–56). With respect to the *Short* decision, the *Chevron Oil* test essentially has been collapsed into a single inquiry: can the plaintiff demonstrate reliance on a previous limitations period. *McCool*, 972 F.2d at 1459. If so, the previous limitations period, and not section 13, applies.

Here, Plaintiffs claim that when they filed this action, they relied on the then existing Illinois statute of limitations, Ill.Ann.Stat. ch. 121½, para. 137.13 D (Smith–Hurd 1960), which they claim permitted indefinite tolling of their claims upon a showing of the Defendants' fraudulent concealment of their securities' fraud. To resolve this issue, then, the Court must determine whether, under *Short* and *Chevron*, the Plaintiffs relied on paragraph 137.13 D when filing this lawsuit. In the opinion of the Court, this issue requires material outside the Amended Complaint and therefore cannot be resolved on a motion to dismiss.

Plaintiffs claim that they first had actual knowledge of the facts leading to this lawsuit in January of 1981. Assuming that, for *Short* statute of limitations purposes, the Plaintiffs' ten year installment contracts were "sold" on the date of purchase, and not when the last payment was made, *see infra* part IV.C.2, the "new" federal statute of limitations, adopted in *Short*, began to run in the years of purchase, i.e. from 1969 to 1975. Therefore, the federal statute of repose, if applicable, cut off Plaintiffs' claims beginning with the first claim, in 1972, and ending with the last claim, in 1975. Thus, if *Short* were

applied, Plaintiffs' claims would have been cut off before they ever knew about them.

Several courts in this district have stated, or implied, that a plaintiff faced with similar circumstances could not demonstrate reliance, as a matter of law. *See, e.g., Lewis v. Hermann*, 775 F.Supp. 1137, 1143–46 (N.D.Ill.1991), *reconsideration denied*, 783 F.Supp. 1131 (N.D.Ill.1991); *In re VMS Sec. Litig.*, 752 F.Supp. 1373 (N.D.Ill.1990). The basis for this position comes from *Short* itself.

In *Short*, the Seventh Circuit abruptly stated, without analysis, that the plaintiff therein could not have relied on Illinois law "because she claims to have been unaware of the basis for litigation until a short time before filing suit." 908 F.2d at 1390. Following this lead, the district judge in *Lewis v. Hermann* stated:

> Similar to the plaintiff in *Short*, because Lewis was unaware of his claims until after the new period of repose [section 13] had expired, he could not have delayed filing in reliance on Illinois law.

*Lewis v. Hermann*, 775 F.Supp. at 1146 (citing *Short*, 908 F.2d at 1390). This "late discovery" rule seems to have some support in the Seventh Circuit's most recent discussion of this issue. *See Ferguson v. Roberts*, 11 F.3d 696, 702–03 nn. 6 & 7 (7th Cir.1993) (seeming to indicate that because the plaintiffs could not have complied with *Short*, had it applied retroactively, they could not demonstrate reliance).

If this late discovery rule, as stated in *Lewis v. Hermann*, were applied to Plaintiffs here, their claims would be barred by the *Short* statute of limitations. However, there also is language in *Ferguson v. Roberts* and in other cases that supports an alternative basis for reliance. These cases seem to indicate that if a plaintiff, at the time he files his lawsuit, and in reliance on Illinois law, forwent an opportunity to pursue his lawsuit in a different forum, he demonstrates reliance. *See Ferguson v. Roberts*, 11 F.3d at 702–03 n. 7 (noting that the plaintiffs had not argued that they missed other opportunities to pursue their claims in reliance on Illinois law); *Eckstein v. Balcor Film Investors*, 8 F.3d

1121, 1129 (7th Cir.1993) (holding that the plaintiffs had relied on Illinois law because they could have filed in a different forum having a different statute of limitations); *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1459 (7th Cir.1992) (holding that *Short* would not apply retroactively because plaintiffs forewent an state court lawsuit in reliance on Illinois law).

Given the necessary factual showing for reliance and the potentially conflicting language with which this subject is discussed, the Court refrains from ruling on this issue on this record, as previously indicated to the parties. Since retroactive application of *Short* would be dispositive, given the Court's determination of the "date of sale" discussed immediately below, the Court proceeds as if the state statute of limitations applied.

### 2. "Date of Sale"

Before turning to an analysis of the state statute of limitations and the applicable tolling rules, the Court determines when the applicable statute of limitations started to run.

■ This analysis begins with noting the traditional understanding as to when a cause of action accrues under section 10(b) and Rule 10b–5. Under both federal and Illinois law, the limitations period for a securities action begins to run with the purchase or sale of a security. Section 10(b) claims start to accrue on the date "the sale of the instrument is completed." *See McCool,* 972 F.2d at 1460. Illinois law, at the time Plaintiffs filed suit, was similar. The relevant limitations statute stated:

No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after three years from the date of sale.

Ill.Ann.Stat. ch. 121½, para. 137.13 D (Smith–Hurd 1960). To the extent that federal and state law differs, the federal rule governs. *See McCool,* 972 F.2d at 1460. Thus, Plaintiffs cause of action accrued on the date the sale of the instrument was completed.

The "investment contracts" here at issue were entered into, depending on the investor,

between 1969 and 1975. These agreements required the individual investors to make payments, on an installment basis, over a period of ten years. Plaintiffs contend that the date of sale for any particular investment contract was completed no earlier than the date the last payment was due under that contract. Thus, Plaintiffs contend that the dates of sale for Plaintiffs' securities run from 1979 to 1985.

In contrast, Defendants contend that the sale of a given investor's security was completed when that investor committed himself or herself to an "investment decision." Such a rule would mean that the "date of sale" was the date on which the investment contracts were originally entered into. Thus, Defendants contend that the dates of sale for Plaintiffs' securities run from 1969 to 1975. The Court agrees.

The theory relied upon by the Court may be traced to the Second Circuit's decision in *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir.1972). *See Goodman v. Epstein,* 582 F.2d 388, 410–14 (7th Cir.1978) (discussing and adopting the approach of *Radiation Dynamics* ), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *see also Ferguson v. Roberts,* 11 F.3d 696, 703–04 (7th Cir.1993) (discussing *Goodman v. Epstein* ). The *Radiation Dynamics* case involved the asserted failure of the defendants therein to disclose material information, as required under section 10(b) and Rule 10b–5, when purchasing stock from the plaintiff. One issue in the case regarded the trial judge's instruction that the materiality of any undisclosed information was to be determined " 'at the date when the parties committed themselves' " to the sale, rather than when the securities were paid for and transferred. *Radiation Dynamics,* 464 F.2d at 890. On appeal from the trial court's decision, the plaintiff argued that even if the defendants did not possess material nonpublic information at the time the plaintiff had agreed to sell its securities to them, defendants were nonetheless liable under the federal securities laws because they had obtained material information before they had paid for the securities and taken possession of them. *Id.* at 890–91.

The Second Circuit rejected the plaintiff's argument, stating:

The essential purpose of Rule 10b–5, as we have stated time and again, is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders.... It was not intended to provide an escape hatch through which disgruntled buyers or sellers could avoid transactions to which they had become committed, but which had not been fully consummated by the formal exchange of the money or the securities agreed upon to be exchanged.

*Id.* (citations omitted).

The Court of Appeals held that, for the purpose of considering the materiality of information held by a purchaser of securities under section 10(b) and Rule 10b–5, the term "purchase or sale" was defined "as the time when the parties to the transaction are committed to one another." *Id.* at 891. "Commitment" was further defined in contractual terms, as:

a meeting of the minds of the parties ... mark[ing] the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.

*Id.*

Although *Radiation Dynamics* defined "sale" in the context of a disclosure issue, courts have assumed that this definition also determines when the statute of limitations begins to run on a claim under section 10(b) and Rule 10b–5. *See* Louis Loss, *Fundamentals of Securities Regulation* 989 n. 7 (2d ed. 1988) (collecting cases). The Seventh Circuit has accepted this use of the *Radiation Dynamics* definition as well, but has created an exception for cases in which continued "investment decisions" are called for after the initial agreement. *See Goodman v. Epstein*, 582 F.2d 388, 409–15 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

In *Goodman*, a group of limited partners brought suit under section 10(b) and Rule 10b–5 against their general partners in a real estate development deal. There, the plaintiffs argued that after execution of the limited partnership agreement, the general partners committed a series of misrepresentations and fraudulent failures to disclose, while at the same time continuing to call for additional capital contributions from the limited partners. *See id.* at 390–95. The trial judge, following *Radiation Dynamics*, instructed the jury that each plaintiff's purchase of a limited partnership interest, the alleged security, was completed upon execution of the limited partnership agreement. The instruction continued: "[E]ach subsequent capital contribution made pursuant to such an agreement does not constitute a purchase of a security." *Id.* at 409. On appeal, the Seventh Circuit reversed.

Although the Seventh Circuit held the district court's instruction to be error, it did not question either the *Radiation Dynamics* definition of a sale or the proposition that a sale so defined ordinarily triggers the running of the statute of limitations. *See id.* at 411–12. The Court of Appeals noted that *Radiation Dynamics* dealt with a "one-shot" deal in which the plaintiff's "investment decision" was completed upon execution of the agreement to sell, leaving undone only the "ministerial exchange of the money for the stock." *Id.* at 412. Refusal to carry out the exchange in *Radiation Dynamics* would have constituted a breach of contract. *Id.* In contrast, the arrangement in *Goodman* "potentially" could have involved a series of investment decisions, each of which would have been made upon a further capital call by the general partners, and each of which was independently actionable under the federal securities laws. *Id.* at 413. A capital call would require an investment decision only if the limited partners could avoid meeting it, perhaps through their power to force dissolution of the partnership. *Id.* Such was a question for the trier of fact. *Id.*[5]

**5.** The Court of Appeals stated the issue as follows:

Whether the facts were such that any remedy to alter the plaintiffs' obligations under the

Agreement would have been available to them was, of course to be determined by the trier of fact in this action. If not, the undisclosed facts were not material, and failure to disclose them

The "investment decision" doctrine explained in *Goodman v. Epstein* was further defined in *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320 (7th Cir.1983). In *Peoria Union*, the plaintiffs, a pension plan, its trustees and its beneficiaries, brought federal securities claims against an insurance company, complaining of fraud in the sale of a "group deposit administration annuity contract" to fund a defined-benefit pension plan. The contract required the employer to make annual contributions, which the insurance company pooled with its other funds for investment purposes. The company's contributions and share of the investment returns were then used to purchase annuities for retiring employees. *Id.* at 322. The plan trustees were entitled to terminate the contract at any time and demand repayment of the net value of the amount on deposit with the insurance company. *Id.* at 323.

In rejecting the defendant's argument that the complaint was time-barred, the Seventh Circuit refused to find that the contract was completed upon its formation. The court reasoned in part: "[I]n fact the contract called for periodic contributions and was therefore a continuing contract. To keep these contributions coming through fraud was fraud in connection with the continuing sale of a security." *Id.* at 326. Because a stream of fraudulent statements and nondisclosures induced the company to continue contributions under the contract, these frauds influenced the making of independent investment decisions.

■ The *Radiation Dynamics, Goodman*, and *Peoria Union* decisions can be summarized as follows. The statute of limitations in actions brought pursuant to section 10(b) and Rule 10b–5 begins to run upon the sale of a security. A sale occurs when the parties to a transaction have obligated themselves to carry it out, with nothing further remaining to be done but the performance of functions such as paying the purchase price and transferring title to, or possession of, the securities. A fraudulent sale of a security is actionable because it is an investment decision based on false information, otherwise inaccurate information, or nonpublic information. The statute of limitations is thus timed to run upon the making of an investment decision. Although sales, or investment decisions, will frequently be complete at the time that the parties have obligated themselves to carry out a transaction, the contractual relationship may contemplate a series of repeated investment decisions, any one of which would be independently actionable under the federal securities laws. Whether a subsequent payment under the contractual relationship involves an independent investment decision depends on the investor's right to refuse to make the payment, and in addition, his right to recoup previously made payments, or use these payments to offset liabilities that can rightly be asserted against him.

■ Here, Plaintiffs allege that they entered into installment sales contracts generally requiring monthly payments over ten years and bearing rates of interest from five percent to seven and a half percent. The sellers were to retain legal title until all payments were made. Although the complaint does not spell out the consequences to the buyers in case they defaulted, it is apparent that the common law would have provided the sellers with actions for breach of contract, subject, of course, to defenses such as fraud in the inducement. The buyers ordinarily would not be entitled to the return of any payments already made, and might have been liable for the remaining installments.[6] The form of installment contract

---

would not be actionable. But so long as an investment decision remained to be made upon any possible state of facts, the nondisclosure was in connection with the purchase of a security.
*Goodman v. Epstein*, 582 F.2d at 413.

**6.** In some circumstances courts have specifically enforced contracts for the sale of land regardless of whether it is buyer or seller who has defaulted. *See* Howard Hunter, *Modern Law of Con-* tracts ¶ 6.02[2] (1986). Installment contracts for the sale of land, however, commonly include liquidated damages clauses, allowing the seller to retake possession and retain any payments made by the buyer in the event of default. *See* Hunter, *supra*, ¶ 6.02[3][d]; *see also Matter of Witte*, 841 F.2d 804 (7th Cir.1988) (repossessing land and retaining previously made payments as liquidated damages precludes an action on the contract or enforcement of previously rendered judg-

alleged in the Amended Complaint was merely a commonly employed financing vehicle for the purchase of land, no different in its economic effect than taking out a loan from a bank and giving a mortgage on the property. Based on this information, the Court concludes that Plaintiffs made their investment decisions on the dates that they entered into their contracts for the purchase of the Rotonda properties. Consequently, those dates are the relevant dates of sale on which the relevant statute of limitations, be it federal or state, started to run.

Plaintiffs argue that the "accrual law of this circuit", as stated in *Baker v. F & F Investment*, 420 F.2d 1191 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 40, 41, 42, 27 L.Ed.2d 49 (1970), dictates that the statute of limitations does not begin to run against federal claims based upon installment contracts until the final payment on the contract

has been made. The *Baker* case, however, was not a securities, but a civil rights case. Its rule must be limited to the facts and circumstances in which it arose.[7]

Plaintiffs also compare their case to *Peoria Union*. This position also fails. The *Peoria Union* case did not involve an installment sales contract, as Plaintiffs contend, but rather an investment contract under which continued investment was entirely optional. The investor was entitled to end the contract at any time and demand repayment of funds previously invested. The *Peoria Union* investor thus faced an investment decision each time a payment under the contract came due.

Unlike in *Peoria Union*, Plaintiffs here faced no investment decision when payments came due under their installment sales contracts. Plaintiffs either continued to pay or faced actions by the seller for breach.[8]

---

ments for unpaid installments). Some courts also have treated land sales financed by installment contracts as mortgage transactions, thus making it possible for a defaulting buyer to recoup some portion of his previously made payments in the form of equity arising from the appreciation of the property value. *See* Hunter, *supra*.

7. *Baker* was a class action brought by African–American purchasers of residential real estate. The plaintiffs alleged that various defendants had conspired to establish racially discriminatory terms in the installment sales contracts they had made with plaintiffs under 42 U.S.C. § 1982 and other sections of the civil rights laws, as well as federal and state antitrust laws. On interlocutory appeal, the Seventh Circuit affirmed the district court's refusal to dismiss the entire case on statute of limitations grounds, holding, in part, that the applicable statutory periods "commenced running only upon the termination of the individual contracts." 420 F.2d at 1200.

*Baker*'s rationale was grounded in the allegations that defendants had entered into a conspiracy to continually violate plaintiffs' rights under the civil rights and antitrust laws. The issue was when the "last overt act" of the conspiracy had been committed, thus triggering the statute of limitations. The court reasoned: "[P]laintiffs have alleged a conspiracy among defendants, the object of which was the establishment of a continuing relationship ... [that] constituted a prolonged and continuing invasion of the rights of the purchasers.... Because of the continuing nature of the overt acts alleged, the statutes of limitations do not commence to run when the contracts were executed but when they terminate." *Id.* at 1200. In a subsequent case, the Seventh Circuit reaffirmed *Baker*'s foundation in

civil conspiracy doctrine, stating: "Because of the 'continuing nature' of the installment purchase contracts involved there, we held that the termination, not the execution of the contracts was the last overt act for limitations purposes." *Scherer v. Balkema*, 840 F.2d 437, 440 (7th Cir.), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

Thus, *Baker* merely addressed one aspect of civil conspiracy doctrine in a case involving civil rights and antitrust claims. It did not suggest that the statute of limitations for every federal claim founded upon an installment contract is stayed until final payment is made on the contract. The Court concludes that *Baker* does not establish, as Plaintiffs assert, a uniform law of accrual for the Seventh Circuit.

8. This is not to say that plaintiffs could not have successfully defended any suits by the sellers, nor is it to discount the possibility that the plaintiffs could have launched preemptive suits for rescission and damages on the grounds of fraud, breach of contract, or the like. But deciding to breach or disaffirm a contract and prosecute or defend a civil suit is not an investment decision. The plaintiffs made their investment decision when they chose to commit themselves to the purchase of land at Rotonda rather than put their money to other uses. The installment sales contracts to which they agreed merely represented a choice of financing vehicles. Had they instead taken out loans, paid the purchase price and given a mortgage in the land, they might nonetheless later have decided to default, suffer foreclosure and independently sue the land developers for any wrongs they might have perpetrated. The decision to default under the loan could hardly be called an investment decision. To label an analogous decision under an install-

While Plaintiffs do allege that their contracts entitled them to refunds if developments were not made as promised, this was not an unconditional right to repayment of funds invested at the investor's option, as was the case in *Peoria Union*. In short, *Peoria Union* did not involve an installment sales contract, and thus did not establish any rule concerning when an installment sales contract is deemed completed under the statute of limitations.

The Court's reading of *Radiation Dynamics*, *Goodman*, and *Peoria Union* is supported by the Seventh Circuit's most recent treatment of this issue. In *Ferguson v. Roberts*, 11 F.3d 696 (7th Cir.1993), the Seventh Circuit held that the statute of limitations for an installment contract started to run on the date the installment contract was originally entered into. The investors in that case had entered into a limited partnership agreement requiring the limited partners to make additional contributions when requested by the general partner. There, as here, additional payments of funds were not considered independent investment decisions. *See id.* at 703–04. There, as here, Plaintiffs did not have an option, under their contracts, to refuse to make investment payments. *See also Young v. Lehigh Corp.*, No. 80–C–4376, 1989 WL 117960 (N.D.Ill. Sept. 28, 1989) (holding that the date of sale for an installment contract was the date of contract formation, not the date of the last payment due).

Accordingly, the Court holds that the "date of sale" for the purposes of either the federal or state statute of limitations is the date upon which the Plaintiffs entered into their investment contracts, not the date upon which the final installment payments on those contracts were due.

### 3. Section 13

Given the Court's holding with respect to the relevant dates of sale, the relevant statute of limitations started to run, for an individual Plaintiff, between 1969 and 1975, when the installment contracts were entered into. Thus, if the *Short* case and its adoption of the three year statute of repose provided in section 13 of the Securities Act of 1933 were

ment sales contract an investment decision is to

applied retroactively, Plaintiffs' claims would have expired in the years between 1972 and 1978, well before this case was filed.

As indicated above, the applicability of section 13 to Plaintiffs' Rule 10b–5 claims must be determined on a motion for summary judgment, if appropriate, not on a motion to dismiss.

### 4. Illinois Limitations Law

Although this action is time barred under the absolute three-year limit established in *Short*, this Court will, for now, continue its analysis under pre-*Short* law. Since the relevant Illinois statute, Ill.Ann.Stat. ch. 121½, para. 137.13 D (Smith–Hurd 1960), provided that "[n]o action shall be brought for relief ... after three years from the date of sale", Plaintiffs' section 10(b) and Rule 10b–5 claims are not timely under the terms of the statute, given the Court's holding with respect to the "date of sale". Consequently, the Rule 10b–5 claims may be salvaged only if section 13 can be tolled or otherwise suspended. In making that determination, the Court faces two questions: (1) do state or federal rules of tolling apply where, as here, the Court borrows a state statute of limitations for a federal cause of action? and, (2) may the Plaintiffs rely on such tolling rules to extend the three years provided by section 137.13 D, as that section was written in 1981?

#### a. Tolling Rules

For the moment, at issue in this case is whether state or federal tolling principles apply to the borrowed section 137.13 D. Under federal tolling rules, a plaintiff may toll, or extend, a statute of limitations in a fraud case in either of two circumstances: (1) the plaintiff demonstrates his due diligence in attempting to discover the fraud, and (2) the defendant actively conceals the fraud. *Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139, 1142 (7th Cir.1990), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir.1990), cert. denied —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). The Illinois state tolling law is similar. The primary difference

elevate form over substance.

between state and federal tolling principles is that, under federal law, a defendant's fraudulent concealment will excuse a plaintiff's lack of due diligence. *See Davenport,* 903 F.2d at 1142 (discussing federal law); *see also Reshal Assocs., Inc. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1244 (N.D.Ill.1990) (stating that federal law, like Illinois law, considers both a plaintiff's due diligence and a defendant's fraudulent concealment, the difference between federal and Illinois law being that federal law permits tolling if one of the two is met, whereas Illinois requires both, at least in circumstances of alleged fraudulent concealment). Given the purported difference between federal and state tolling principles, Plaintiffs seek to insure that federal principles apply here, thereby permitting them to rely on Defendants' alleged fraudulent concealment without having to demonstrate due diligence in protecting their interests. As the analysis below indicates, the applicable law in this Circuit, pre-*Short,* permits Plaintiffs to attempt to toll the Illinois limitations statute using either federal or state tolling principles.

Prior to the Supreme Court's decisions in *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), and *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the traditional treatment of state statutes of limitation borrowed for federal actions had been to assume that the federal actions borrowed only the state law time period, thereby leaving federal law to determine the applicability of tolling doctrines. *See, e.g., Tomera v. Galt,* 511 F.2d 504, 509 (7th Cir.1975), *overruled by Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). In *Johnson, Tomanio,* and their progeny, however, the Supreme Court has held that actions brought under the civil rights law borrow not only the state statutory period, but also related state tolling rules and related doctrines. *See Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Chardon v. Fumero Soto,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983); *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); *Johnson v. Railway*

*Exp. Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

In an attempt to resolve the apparent tension between these intervening Supreme Court decisions and its own precedent under *Tomera,* a panel of the Seventh Circuit reasoned that both federal and state rules of tolling could apply to actions brought under section 10(b) and Rule 10b-5. *See Suslick v. Rothschild Sec. Corp.,* 741 F.2d 1000, 1004–05 (7th Cir.1984). Under *Suslick,* federal and state tolling principles were "stacked". *See Cange v. Stotler & Co.,* 826 F.2d 581, 600 (7th Cir.1987) (Easterbrook, J. concurring). For pre-*Short* cases, this stacking often requires analysis under both federal and state tolling law. *See Davenport v. A.C. Davenport & Son Co.,* 903 F.2d 1139, 1143 (7th Cir.1990) (applying both federal and state tolling law in holding that the plaintiff therein had failed to satisfy the statute of limitations), *overruled by Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990).

Although *Suslick* has been questioned several times in this Circuit, it remains the law. *See McCool v. Strata Oil Co.,* 972 F.2d 1452, 1461 (7th Cir.1992) (noting the repeated questioning of *Suslick* but stating that the case remains the law in the Seventh Circuit); *Smith v. City of Chicago Heights,* 951 F.2d 834, 839–40 & n. 6 (7th Cir.1992) (questioning the soundness of *Suslick* ); *Cange v. Stotler & Co.,* 826 F.2d 581, 600 (7th Cir.1987) (Easterbrook, J., concurring in part and concurring in judgment) (same); *Norris v. Wirtz,* 818 F.2d 1329, 1331–33 (7th Cir.) (Easterbrook, J.) (same), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987). Accordingly, to apply pre-*Short* law, this Court must consider both federal and state tolling principles.

#### b. Section 137.13 D

At the time Plaintiffs filed this lawsuit, the Illinois limitations statute for securities actions stated:

> No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after three years from the date of sale.

Ill.Ann.Stat. ch. 121½, para. 137.13 D (Smith–Hurd 1960). In 1986, amendments to section 137.13 D took effect. The amended section says:

> No action shall be brought for relief under this Section ... after 3 years from the date of sale, provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation ... the 3 year period shall begin to run upon the earlier of:
>
> (1) the date upon which the party bringing such action has actual knowledge of the alleged violation of this Act; or
>
> (2) ... but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable.

Ill.Ann.Stat. ch. 121½, para. 137.13 D (Smith–Hurd Supp.1992).[9] The 1986 amendment to section 137.13 D thus created a three year statute of limitations and permitted tolling of that statute for up to, but no more than, two more years, thereby also creating a five year statute of repose. The amended statute of limitations/repose is relevant to this case in that it has been used to demonstrate that the previous statute was a statute of repose, not a statute of limitations.[10]

The Interpretive Comments to the amended version of section 137.13 D, in part, say:

> This tolling amendment was designed particularly to cover cases of fraudulent concealment or so-called "lulling" activities by promoters. Heretofore, the three-year statute of limitations could be an absolute bar to an action even if discovery was not reasonable or subverted.

Ill.Ann.Stat. ch. 121½, para. 137.13, Interpretive Comments, § 13.D. (Smith–Hurd Supp. 1992). Analyzing the 1986 amendment, in conjunction with this comment, two Seventh Circuit panels have concluded that the old section 137.13 D was probably a statute of repose. *See Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139, 1143 (7th Cir.1990) (stating that the old section 137.13 D was

probably a statute of repose and proceeding to analyze state tolling law under that assumption); *Norris v. Wirtz*, 818 F.2d 1329, 1333–34 n. * (7th Cir.1987) (stating in dicta that old section 137.13 D was probably a statute of repose). After the first of these decisions, *Norris v. Wirtz*, two district courts rejected the proposition therein that old section 137.13 D was a statute of repose. *See Pucci v. Santi*, 711 F.Supp. 916, 922–25 (N.D.Ill.1989); *Zahorik v. Smith Barney, Harris Upham & Co.*, 664 F.Supp. 309, 312 (N.D.Ill.1987). Neither *Pucci* nor *Zahorik*, however, had the benefit of the Seventh Circuit's opinion in *Davenport*.

Whatever uncertainty was created by the two district courts' disagreements with the *Norris* dicta has now been eliminated by the Appellate Court of Illinois for the Second District. In *Rein v. David A. Noyes & Co.*, 230 Ill.App.3d 12, 172 Ill.Dec. 204, 595 N.E.2d 565 (Ill.App.Ct.1992), the Appellate Court specifically stated that it agreed with the *Davenport* discussion. The *Rein* court, the only Illinois state court to discuss this issue, concluded that "the language of the old statute, especially considered in light of the interpretive comments ... demonstrates that the old statute imposed a three-year period of repose." *Id.*, 172 Ill.Dec. at 208, 595 N.E.2d at 569. That decision specifically rejected *Pucci. See id.*, 172 Ill.Dec. at 208–09, 595 N.E.2d at 569–70.

 Given the Seventh Circuit's statements in *Norris* and *Davenport* and the Illinois state decision in *Rein*, the Court concludes that the old section 137.13 D was a statute of repose.

By virtue of the fact that section 137.13 D is properly considered a statute of repose, the Court might immediately conclude that it may not be tolled beyond the three years it allows for the filing of a securities action. However, some courts have held that when a state statute of repose is borrowed for a federal cause of action, it may be extended by federal tolling provisions. *See Reshal,*

---

9. Currently codified at 815 ILCS 5/13 (Smith–Hurd 1993).

10. Defendants argue that the amended statute of limitations/repose should be applied retroactively. They do not provide the Court with sufficient authority to justify that position, however.

754 F.Supp. at 1242–43 (discussing cases). The Court thus briefly addresses itself to that task, analyzing the issue under both state and federal tolling principles, as required by *Suslick* and other pre-*Short* law.

With respect to state tolling principles, analysis simply requires the statement of the above conclusion: under state tolling provisions, a statute of repose may not be tolled. *See Reshal,* 754 F.Supp. at 1242 (stating that the language of the new section 137.13 D clearly indicates that the new statute of repose cannot be tolled by state tolling principles).

A more difficult question is presented when federal tolling principles are considered. *See id.* (indicating that some courts have permitted federal tolling principles to extend state statutes of repose). In the opinion of the Court, however, a statute of repose is exactly that: it cannot be extended by tolling principles. As stated in *Reshal* and in *Morley v. Cohen,* 610 F.Supp. 798 (D.Md. 1985), the similarity between a state statute of repose and the statute of repose in section 13 of the Securities Act of 1933 indicates that such a statute is not inconsistent with federal policy. In fact, as stated in *Short,* such a statute is supported by federal policy. *See Reshal,* 754 F.Supp. at 1243. The Court thus concludes, as would seem to be implicit in defining the statute as one of repose, that old section 137.13 D cannot be extended by federal tolling principles. As a result, the old section 137.13 D is not subject to any tolling at all. *Cf. Reshal,* 754 F.Supp. at 1242 n. 15 (indicating that this conclusion might be dictated by *Davenport,* 903 F.2d at 1143, and by *Norris v. Wirtz,* 818 F.2d at 1333–34 n. *).

#### c. Retroactive Application of the Rein Case

The conclusion, in *Rein v. David A. Noyes & Co.,* 172 Ill.Dec. 204, 595 N.E.2d 565 (Ill. App.Ct.1992), that the old section 137.13 D is actually a statute of repose might present similar retroactivity concerns as those presented by *Short.* At issue is whether the *Rein* case "overrules clear precedent" or "addresses an issue of first impression" as required by *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). Unlike *Short, Rein* may not have instituted a "new rule".

Because *Rein* had not been decided when the parties briefed this motion and because the parties have not had the opportunity to consider its potential retroactive application, and have not elaborated on the retroactive effect of *Davenport* or *Norris,* the Court concludes that these issues are more appropriately addressed on a motion for summary judgment.

#### d. Plaintiffs' Allegations Regarding Tolling

Assuming that neither *Short* nor *Rein* applies to this case, the continued precedential effect of the *Suslick* decision indicates that Plaintiffs may survive the instant motion to dismiss by alleging facts sufficient to demonstrate either their due diligence in protecting their investments or the Defendants' concealment of their fraud. In the opinion of the Court, Plaintiffs' due diligence is not demonstrated in the Amended Complaint.[11] However, Plaintiffs do allege facts sufficient to demonstrate the Defendants' fraudulent concealment.

Plaintiffs' Amended Complaint supports the conclusion that the Defendants made numerous representations attempting to conceal their fraud. Through the medium of the *Rotonda Review,* as well as through other statements issued by the developers, Plaintiffs were repeatedly informed that progress on the development was continuing more or less as planned. The *Rotonda Review* did not report that other purchasers had filed lawsuits against the developers, nor did it report that the properties were depreciating. All of these representations or omissions, Plaintiffs contend, effectively forestalled any investigation by them of the deteriorating conditions at Rotonda. The Amended Complaint does admit, however, that the Plaintiffs were notified that the Federal Trade Commission was taking action against Cavanagh.

---

11. While Plaintiffs are not required to plead facts to this effect, they have plead facts that could reasonably be construed to demonstrate lack of diligence.

Although the Amended Complaint states that the Defendants sought to divert Plaintiffs' attention from the real objects of the FTC investigation, Defendants contend that the Plaintiffs have admitted to receiving actual notice of the Defendants' fraud. If the Plaintiffs did receive such notice, it would most likely cut off any further equitable tolling. *See Tate v. Beverly Chrysler Plymouth,* 182 Ill.App.3d 830, 131 Ill.Dec. 288, 538 N.E.2d 663 (1989). However, the Court cannot rely on evidence outside the allegations in the Amended Complaint in ruling on a Motion to Dismiss. While Defendants have submitted substantial evidentiary materials tending to indicate either lack of due diligence on Plaintiffs' part or actual notice of Defendants' fraud, or both, the Court defers consideration of these materials to a renewed motion for summary judgment on the limitations issues discussed here and above.

Defendant McMahon argues that Plaintiffs repeatedly have failed to distinguish his participation in the Rotonda development from the actions of the other developers, and that while the Amended Complaint may suffice to state a claim against his Co–Defendants, it is irredeemably flawed with respect to him. However, this matter is being heard on motion to dismiss, and all reasonable inferences must be drawn in favor of Plaintiffs. Plaintiffs have alleged that McMahon, in exchange for at least an additional $100,000, turned a deaf ear to complaints about the Rotonda development, and that the developers continued to use his name and likeness on sales materials. Evidence of the factual circumstances concerning that deal and McMahon's relationship to the Rotonda development may help determine whether the applicable statute of limitations or repose had run in favor of McMahon at the time this case was filed. However, that information is not alleged in the Amended Complaint and is beyond the scope of the instant inquiry.

### 5. Summary of Plaintiffs' Section 10(b) and Rule 10b–5 Claims

With respect to Plaintiffs' Section 10(b) and Rule 10b–5 claims, Defendants' Motions to Dismiss are denied. Plaintiffs have alleged facts sufficient to demonstrate that their installment contracts are securities. Because the purchase of those installment contracts was the single investment decision made by a particular Plaintiff, the relevant statute of limitations, either federal or state, started to run as to that Plaintiff's claim on the date the installment contract was entered into. Although the relevant statute of limitations started to run as early as 1969 and no later than 1975, the Court cannot determine, on a motion to dismiss, when it ceased to run.

The following issues must be addressed on a motion for summary judgment: (1) whether Plaintiffs relied on Illinois law in filing their claim, thereby preventing the retroactive application of *Short;* (2) whether the old Illinois limitations statute, as interpreted in *Rein,* should be retroactively interpreted as a statute of repose; (3) whether the Defendants can demonstrate that the Plaintiffs received actual notice of Defendants' possible fraud and that the Plaintiffs were less than diligent in protecting their investments; and (4) whether Defendant McMahon is responsible for any fraudulent concealment of Plaintiffs' fraud claims.

### D. Plaintiffs' Section 12(2) Claims

In Count Three, Plaintiffs allege that the Defendants violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (1988). The Court's discussion of when a "sale" takes place under section 10(b) is dispositive of this claim.

Section 12(2) creates an express private right of action which is governed by the statute of limitations contained in section 13 of the 1933 Act. As indicated in the Court's discussion of the *Short* case, section 13 establishes a one year statute of limitations and a three year statute of repose, both of which start to run from the "date of sale."

Although claims under section 10(b) and Rule 10b–5 are governed by definitions in the Securities Exchange Act of 1934 while claims under section 12(2) are governed by definitions in the Securities Act of 1933, the definitions for "security" and "date of sale" must

be treated the same.[12] Therefore, with respect to Plaintiffs' section 12(2) claim, the Court finds that the statute of limitations provided in section 13 started to run on dates between 1969 and 1975. Even if these dates were tolled, they were not tolled beyond 1972 and 1978, as specified by the three year statute of repose included in section 13.

■ By its express terms, section 13 permits only limited tolling. The section specifically states that "[i]n no event shall any such action be brought to enforce a liability created ... under section 12(2) ... more than three years after the sale." The language of the statute indicates that this cutoff is absolute, and the Seventh Circuit agrees. *See, e.g., Cange v. Stotler & Co.*, 826 F.2d 581 (7th Cir.1987) (indicating that section 13 may not be extended with equitable tolling principles). The vast majority of courts also take this position. *See, e.g., Corwin v. Marney, Orton Invs.*, 788 F.2d 1063, 1066 (5th Cir.1986); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Hernandez v. Childers*, 736 F.Supp. 903, 909–10 (N.D.Ill.1990); *Armbrister v. Roland Int'l Corp.*, 667 F.Supp. 802, 823 (M.D.Fla.1987); *Gutfreund v. Christoph*, 658 F.Supp. 1378, 1389 (N.D.Ill.1987); *see also* Loss, *supra*, at 990 (stating that, for sections 12(1) and 12(2), "the three-year cutoffs are absolute"). Against this precedent Plaintiffs submitted a single case, a district court case which has since been reversed, with respect to its decision regarding section 12(2). *See In re Home–Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 337 (N.D.Okla.1975), *rev'd sub nom. Anixter v. Home–Stake Prod. Co.*, 939 F.2d 1420 (10th Cir.1991) (holding that both section 12(2) and Rule 10b–5 claims are time-barred by section 13), *cert. granted and judgment vacated on other grounds sub nom. Dennler v. Trippet*, — U.S. —, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992) (vacating and remanding for further consideration in light of the amended section 27A of the Securities Exchange Act of 1934), *on remand on other grounds, Anixter v. Home–Stake Prod. Co.*, 977 F.2d 1533 (10th Cir.1992) (discussing section 13 with respect to Rule 10b–5 claims but not re-addressing any section 12(2) claim), *rehearing granted in part by* 977 F.2d 1549 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993), *and cert. denied*, — U.S. —, 113 S.Ct. 1842, 123 L.Ed.2d 467 (1993), *and cert. denied*, — U.S. —, 113 S.Ct. 1842, 123 L.Ed.2d 467 (1993). The Court adheres to the majority view.

Having previously concluded that on the face of the Amended Complaint no sale was made later than 1975, and having further concluded that actions under section 12(2) must be brought no later than three years from the date of sale, the Court holds that Plaintiffs' section 12(2) claims are time-barred.

Accordingly, with respect to Count Three, which asserts Plaintiffs' section 12(2) claims, Defendants' Motions to Dismiss are granted, with prejudice.

## V. PLAINTIFFS' ILSFDA CLAIMS

In Counts Four and Five, Plaintiffs assert claims under the Interstate Land Sales Full Disclosure Act ("ILSFDA"), *see* 15 U.S.C. §§ 1701–1720 (1988). As with Plaintiffs' securities claims, Defendants assert the applicable statute of limitations as a bar. The Court agrees.

---

**12.** Section 2(3) of the 1933 Act provides that "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3) (1988). This definition is for practical purposes indistinguishable from the definition contained in the 1934 Act. *See* 15 U.S.C. § 78c(a)(14) (1988). The Court concurs with those courts which have concluded that a "sale" under the 1933 Act should be defined the same as a "sale" under the 1934 Act. *See, e.g., Amoroso v. Southwestern Drilling Multi–Rig Partnership No. 1*, 646 F.Supp. 141, 142–43 (N.D.Cal.1986); Louis Loss, *Fundamentals of Securities Regulation* 989 n. 7 (2d ed. 1988). Plaintiffs ask the Court to follow the definition of "sale" applied in *Ambling v. Blackstone Cattle Co.*, 650 F.Supp. 170 (N.D.Ill.1987). The *Ambling* case, involving the formation of a limited partnership, is distinguishable on its facts, arguably falling within the investment decision doctrine of *Goodman v. Epstein*, 582 F.2d 388 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Moreover, to the extent that *Ambling* relied upon the definition of "sale" under the securities law of Illinois by citing *Silverman v. Chicago Ramada Inn, Inc.*, 63 Ill.App.2d 96, 211 N.E.2d 596 (1965), the Court respectfully disagrees with its analysis.

The applicable statute of limitations is the pre–1979 version of the limitations section of ILSFDA in effect at the time Plaintiffs filed this action. *See* 15 U.S.C. § 1711 (1976).[13] That section said:

> No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) of this title, unless brought within two years after the violation upon which it is based. *In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser.*

15 U.S.C. § 1711 (1976) (emphasis added).

As with Plaintiffs' securities claims, the Court finds that a "sale" took place on the date Plaintiffs entered into their installment contracts. Thus, under the pre-1979 section 1711, Plaintiffs' ILSFDA claims expired between 1972 and 1978.

Plaintiffs argue that a "sale" is not completed under the ILSFDA until all payments have been made on an installment contract and title has passed. Alternatively, they argue that the applicable statute of limitations can be equitably tolled. Neither argument is persuasive.

 A "sale" under the ILSFDA is made upon contract formation. *Yeomans v. Le Triomphe Partnership,* 884 F.2d 847, 848–49 (5th Cir.1989); *Cook v. Deltona Corp.,* 753 F.2d 1552, 1561–62 (11th Cir.1985); *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1043–44 (10th Cir.1980).[14] The Court agrees with the analyses of *Yeomans, Cook* and *Aldrich.* The Court emphasizes that real estate is commonly sold by means of installment contracts. Had Congress intended the time of title transfer to determine when a sale had occurred, it could easily have written the statute to achieve this goal. *Cf. Aldrich,* 627 F.2d at 1044 (stating that "It is entirely consistent with stated congressional objectives to define 'sale' in a real estate market as contract formation rather than contract discharge. Real estate payments are commonly not completed for decades."). The Court therefore rejects the contrary view expressed in *Hadad v. Deltona Corp.,* 535 F.Supp. 1364, 1368–69 (D.N.J.1982), *aff'd,* 725 F.2d 668 (3d Cir.1983). The ILFSDA statute of limitations, modeled after Section 13 of the Securities Act of 1933, is an absolute bar to actions brought more than three years from the date of sale. *Cook,* 753 F.2d at 1562; *Darms v. McCulloch Oil Corp.,* 720 F.2d 490, 494 (8th Cir.1983); *Aldrich,* 627 F.2d at 1042–43; *Timmreck v. Munn,* 433 F.Supp. 396, 408–09 (N.D.Ill.1977).[15] This

**13.** In 1979, Congress comprehensively revised the ILSFDA, including its statute of limitations. *Compare* 15 U.S.C. § 1711 (1976) *with* 15 U.S.C. § 1711 (1988). Plaintiffs refuse to concede that the 1979 amendments are inapplicable to their action, but argue that because their claims are timely under either version of the statute of limitations, the Court need not address this issue. The Court agrees with those that have concluded that Congress did not intend the 1979 amendments to apply to transactions entered into before the effective date of the amendments. *See Cook v. Deltona Corp.,* 753 F.2d 1552, 1559 n. 3 (11th Cir.1985) (stating: "Because the events giving rise to this litigation took place prior to 1979, and because the 1979 amendments are not retroactive, *see Fitzgerald v. Century Park, Inc.,* 642 F.2d 356 (9th Cir.1981), in reviewing [plaintiff's] claims under the [ILSFDA] we look to the law in effect prior to 1979."). The Court thus holds that the pre–1979 version of the ILSFDA, including its statute of limitations, applies to Plaintiffs' claims.

**14.** Plaintiffs again urge that *Baker v. F & F Investment,* 420 F.2d 1191 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 40, 41, 42, 27 L.Ed.2d 49 (1970), establishes a uniform rule in the Seventh Circuit for determining when a sale has occurred. For the reasons previously indicated, the Court rejects that argument.

**15.** *Cf. Bomba v. W.L. Belvidere, Inc.,* 579 F.2d 1067 (7th Cir.1978). In *Bomba,* the court of appeals stated:

> Though we might well agree with the district court that the unequivocal language of 15 U.S.C. § 1711 presents an insurmountable barrier to the *tolling* of the three-year limitations period contained therein, we cannot agree that the "In no event" terms in which the three-year limitations period is expressed forecloses possible application of the separate and distinct doctrine of equitable estoppel.

*Id.* at 1070 (emphasis in original). The Court continued:

> [T]he cases are legion that a promise to pay a claim will estop a defendant from asserting the

analysis is similar to that interpreting section 13 of the Securities Act of 1933. Given this authority, the Court finds that the three-year statute of limitations cannot be equitably tolled. It follows that Plaintiffs' claims under the ILSFDA are time-barred.

Accordingly, with respect to Counts Four and Five, containing Plaintiffs' claims under the ILSFDA, Defendants' Motions to Dismiss are granted, with prejudice.

## VI. PLAINTIFFS' RICO CLAIMS

In Count One, Plaintiffs make the general allegation that the Defendants are liable under 18 U.S.C. § 1964 (1988), the civil remedy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as amended, 18 U.S.C. §§ 1961–1968 (1988).[16]

RICO does not provide an express statute of limitations for actions brought under its civil enforcement provisions. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 145, 107 S.Ct. 2759, 2761, 97 L.Ed.2d 121 (1987). In that case, the Supreme Court held that civil RICO actions should be subject to a uniform statute of limitations borrowed from antitrust law's Clayton Act, 15 U.S.C. § 15b. That section provides for a four year statute of limitations.

As with Plaintiffs' securities and ILSFDA claims, Defendants assert that Plaintiffs' RICO claims are time barred. Once again at issue are the questions of when the statute of limitations starts to run and whether the doctrine of equitable tolling extends the statute.

As stated in *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1464 (7th Cir.1992), the Seventh Circuit has now adopted the "discovery rule"

for civil RICO claims.[17] Under the discovery rule, the statute of limitations starts to run "once there was a RICO violation and the plaintiffs knew or should have known that they were injured." *Id.* at 1464 (citing the district court decision *McCool v. Strata Oil Co.,* 724 F.Supp. 1232, 1237–38 & n. 3 (N.D.Ill.1989)).

At this point in this litigation, on a motion to dismiss, the Court is unable to determine a specific date upon which Plaintiffs' RICO claims accrued and when the statute of limitations started to run. As indicated in the Court's similar discussion of the tolling principles applicable to Plaintiffs' securities claims, these issues are better resolved on a motion for summary judgment. In particular, while it appears that federal equitable tolling principles apply to the adopted RICO statute of limitations, *see McCool,* 972 F.2d at 1465, it remains to be resolved, as Plaintiffs here argue, whether, as stated in *Suslick,* a defendant's fraudulent concealment excuses a plaintiff's lack of diligence in failing to discover his cause of action. A review of the authority cited in *McCool* appears to indicate that a plaintiff must be diligent in protecting his interests. *See McCool,* 972 F.2d at 1465. However, as indicated, the Court will defer ruling on this issue to a motion for summary judgment, if appropriate.

Accordingly, with respect to Count One, Defendants' Motions to Dismiss are denied without prejudice.

## VII. PLAINTIFFS' COMMON LAW CLAIMS

In Counts Six and Seven, respectively, Plaintiffs claim that they were defrauded by the Defendants and that Defendant Cav-

---

applicable statute of limitations if the plaintiff relied in good faith on defendant's promise in forbearing suit.... [A]ll that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit.

*Id.* at 1071 (citations omitted). Plaintiffs have neither pleaded nor argued that defendants ever promised to pay their claims.

**16.** The Court notes that Plaintiffs do not specify which prohibited racketeering activities they claim the Defendants have engaged in. *See* 18 U.S.C. § 1962 (1988). As this concern was not

raised in Defendants Motions to Dismiss, the Court leaves the issue for resolution on a motion for summary judgment, if appropriate.

**17.** The "discovery rule" is contrasted with the "last predicate act" rule under which the four year statute of limitations starts to run "from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity." *McCool v. Strata Oil Co.,* 972 F.2d at 1464 (quoting *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1130–31 (3d Cir.1988)).

anagh Communities breached a contract with the Plaintiffs. In addition to a possible statute of limitations argument, Defendant McMahon, to whom only Count Six applies, contends that the Court lacks jurisdiction over the fraud claim.

For the reasons stated in the Court's analysis of Plaintiffs' securities and RICO claims, the Court will address any statute of limitations and tolling arguments on a proper motion for summary judgment.[18] Issues of pendent jurisdiction may also be resolved at that time.

## VIII. CONCLUSION

For the foregoing reasons, all outstanding Motions for Summary Judgment are denied, without prejudice. Defendants' Motions to Dismiss are granted with respect to Plaintiffs' claims under sections 17 and 12(2) of the Securities Act of 1933, and with respect to Plaintiffs' claims under the Interstate Land Sales Full Disclosure Act. With respect to Plaintiffs' remaining claims, the Motions to Dismiss are denied without prejudice.

---

**18.** Fraudulent concealment tolls the Illinois statute of limitations against defendants accused of committing overt acts of fraudulent concealment. *Chicago Park Dist. v. Kenroy, Inc.*, 78 Ill.2d 555, 37 Ill.Dec. 291, 402 N.E.2d 181 (1980). Furthermore, acts of fraudulent concealment can be imputed to defendants who have not themselves committed fraudulent concealment given the existence of privity or an agency relationship with defendants who have actually concealed fraud. *See id.*